**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CHRISTY WEBBER & COMPANY, on behalf of itself and all others similarly situated,

        *Plaintiff,*

    v.

DEERE & COMPANY,

        *Defendant.*

Case No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**Table of Contents**

INTRODUCTION ................................................................................................................... 1

I.      NATURE OF THE ACTION ...................................................................................... 5

II.     JURISDICTION AND VENUE .................................................................................. 9

III.    PARTIES ................................................................................................................... 10

   A.   Plaintiff .................................................................................................................. 10

   B.   Defendant and Co-Conspirators............................................................................. 13

IV.     INTERSTATE TRADE AND COMMERCE ........................................................... 15

V.      DEERE'S AND THE CO-CONSPIRATORS' MARKET POWER IN THE RELEVANT
MARKETS ........................................................................................................................... 16

   A.   Barriers to Entry and Switching Costs................................................................... 17

   B.   Restricted Deere C&F Repairs................................................................................ 18

   C.   Replacement Parts for Deere C&F Equipment....................................................... 19

   D.   The Fully Functional Tool ...................................................................................... 20

   E.   Geographic Market ................................................................................................. 21

VI.     FACTUAL ALLEGATIONS .................................................................................... 21

   A.   The Construction & Forestry Industry.................................................................... 21

   B.   Deere & Company Background................................................................................ 22

   C.   Deere's Consolidation of the Construction & Forestry Dealer Network.......................... 24

   D.   Deere Continually Fails to Provide Access to the Fully Functional Tool ....................... 29

      i.    The Advent of the Fully Functional Tool and the Conspiracy to Restrict Access to It 30

      ii.   Deere Offers A Limited Version of Service ADVISOR to the Public ......................... 35

      iii.  Deere Maintains Its Control Even With Increased Scrutiny................................... 36

      iv.   Deere and the Deere Dealers Fight Right to Repair ................................................ 40

      v.    Deere Again Alters Customer Service ADVISOR In an Effort to Appease the Public
      and Deere C&F Equipment Owners ........................................................................ 44

   E.   In the Face of Antitrust Litigation, Deere Continues to Move the Goal Posts ................. 46

   F.   Additional Deere Repair Restrictions Have Been Overruled by the EPA....................... 50

VII.    DEERE'S ANTICOMPETITIVE CONDUCT BENEFITS DEERE AND THE DEERE
DEALERS WHILE HARMING COMPETITION AND INJURING THE CLASS ................. 52

VIII.    ANY PROCOMPETITIVE OR BUSINESS JUSTIFICATION DOES NOT
LEGITIMIZE DEERE'S CONDUCT ...................................................................................... 57

IX.    CLASS ACTION ALLEGATIONS .................................................................. 58

VIOLATIONS ALLEGED ........................................................................................ 60

PRAYER FOR RELIEF ............................................................................................ 72

DEMAND FOR JURY TRIAL ................................................................................. 72

Plaintiff Christy Webber & Company ("Christy Webber"), on behalf of itself and all others similarly situated, brings this class action complaint against Defendant Deere & Company ("Deere") for violations of federal antitrust law. Based upon personal knowledge as to the facts pertaining to itself, upon information and belief, and upon the investigation of counsel, Plaintiff alleges the following:

## INTRODUCTION

1. For nearly 200 years, Deere "has supported those who shape our world. From the farmers who grow our food; to the contractors who build our roads, homes, schools, and community infrastructure; and to the caretakers of our parks and sports arenas."[1] Yet while surveys show that Deere enjoys a high degree of brand loyalty, Deere has undertaken a campaign to exploit that very loyalty to wrongfully extract monopoly rents from its customers.

2. The focus of antitrust enforcement against Deere to date has concerned the agricultural community. Those enforcement efforts have focused on how Deere restricts farmers' ability to fix agriculture equipment like tractors and combines, forcing them to seek repair services from one of Deere's authorized dealers. Despite the public scrutiny of Deere's restrictions on agriculture equipment repairs, to date, few have noted the impact of similar anticompetitive restrictions in another massive segment of Deere's business—Construction and Forestry ("C&F"). In the over $11 billion dollar C&F segment, which constitutes 25% of Deere's 2025 revenue, Deere has pursued the same anticompetitive scheme condemned by courts, regulatory agencies, and the public for its harmful effects on farmers.

3. Like tractors and combines, pieces of Deere C&F equipment are expensive, long-lived, software-dependent capital assets. When Deere withholds the fully functional repair tools

---

[1] John Deere, *Celebrating Our Customers*, https://about.deere.com/en-us/our-company-and-purpose/celebrating-our-customers.

1

needed to diagnose, calibrate, reprogram, clear codes, pair parts, and return them to service, Deere C&F equipment owners face the same lock-in, delays, overcharges, and loss of repair choice that has drawn judicial, regulatory, and public ire in the agriculture segment. Antitrust enforcement has exposed Deere's scheme, but has not remedied the harm suffered by Deere C&F equipment owners. This lawsuit seeks to change that.

4.      Deere's exploitation of C&F equipment owners began as part of a Deere strategy to increase profitability by restricting the ability of Deere customers to independently repair the equipment that those customers purchased from Deere. Specifically, Deere, which is a leading manufacturer in the C&F market segment, and its authorized network of C&F dealers and technicians (collectively, "Deere Dealers"), have agreed to stifle competition in the aftermarket for repair services for Deere C&F equipment. Deere abuses its monopoly power in that market to force Deere C&F equipment owners to use a Deere Dealer for many key repairs, and through those repairs, also forces those equipment owners to purchase replacement parts sold by Deere (hereinafter, "Restricted Deere C&F Repairs" and "Deere C&F Parts," respectively). In so doing, Deere and the Deere Dealers eliminate competition from all Deere C&F equipment owners who wish to repair their own equipment, as well as from repair services offered by independent repair providers ("IRPs"). As a result of this conduct, Deere and the Deere Dealers completely control the market for Restricted Deere C&F Repairs, thereby coercing Deere C&F equipment owners to purchase labor and parts at artificially inflated prices.

5.      Deere's scheme centers on its ability to restrict owners' and IRPs' access to the tools and technical information that are necessary for performing repairs on Deere C&F equipment. Specifically, newer Deere C&F equipment requires a tool to diagnose and effect repairs of Deere C&F equipment. This tool has both a hardware and software component. On the hardware

2

side, the tool consists of an Electronic Data Link ("EDL") interface, cables, and a computer. Deere does not restrict owner or IRP access to any of this hardware. On the software side, the necessary components include diagnostic manuals, technical manuals, a fault code lookup, calibration procedures, machine diagnostics and other associated software. Deere controls access to the software side of the tool through licenses and subscriptions.

6. Deere Dealers have exclusive access to the necessary software and information that allow for diagnosis and completion of all repairs to Deere C&F equipment because Deere has chosen to license this software or otherwise provide the accompanying informational materials only to Deere Dealers (hereinafter, such software and information will be collectively referred to as the "Fully Functional Tool"). Accordingly, for years, Deere has exclusively licensed the Fully Functional Tool to its co-conspirator Deere Dealers and not to Deere C&F equipment owners or IRPs. In so doing, Deere has prevented meaningful competition from those C&F equipment owners who otherwise could repair equipment themselves and from IRPs, raising the prices of repairs and replacement parts, increasing turnaround times, and lowering the quality of service.

7. Over the years, Deere has faced growing scrutiny for its suppression of competition. In an insincere attempt to limit this continuing backlash, Deere has offered various half measures to Deere C&F equipment owners, providing them with incomplete and otherwise limited versions of the Fully Functional Tool that cannot completely diagnose problems or otherwise allow owners and IRPs to perform all necessary repairs to Deere C&F equipment.

8. To date, Deere and its co-conspirator Deere Dealers retain exclusive access to the Fully Functional Tool. There is no reason—technological or otherwise—why Deere cannot provide owners and IRPs with access to the Fully Functional Tool. Deere and its co-conspirators choose not to do so in order to increase profitability in repair aftermarkets by forcing Deere C&F

3

equipment owners to use Deere Dealer repair services for all Restricted Deere C&F Repairs and, for all such repairs, purchase Deere C&F Parts, at artificially inflated prices.

9.      Deere, for years, has repeatedly and misleadingly represented that owners can maintain, diagnose, and repair their Deere C&F equipment—all the while withholding the full functionality necessary to complete all repairs on Deere C&F equipment and failing to disclose which repairs would remain dealer-only and require a Deere Dealer to perform Restricted Deere C&F Repairs. Deere and the Deere Dealers have therefore intentionally distorted the true cost of ownership of Deere C&F equipment and thus failed to provide Deere C&F equipment owners with any way to reliably ascertain the actual life-cycle costs for their products. Deere has compounded this problem by repeatedly changing its policies for repairs, while at the same time continuing to misrepresent which repairs were still Restricted Deere C&F Repairs. In short, Deere C&F equipment owners cannot and, since the start of Deere's scheme, have not been able to, reliably ascertain the true life-cycle cost of owning Deere C&F equipment.

10.     This anticompetitive scheme echoes the same conduct utilized by Deere for its agriculture equipment business segment. That conduct has been the subject of significant press and is currently being litigated in two separate antitrust cases—a class action antitrust lawsuit, *In re Deere & Company Repair Service Antitrust Litigation*, Case No. 3:22-cv-50188 (N.D. Ill.) (hereinafter, the "Ag Class Case"), and a lawsuit by the Federal Trade Commission and five states, *Federal Trade Commission v. Deere & Company*, Case No. 3:25-cv-50017 (N.D. Ill.) (hereinafter, the "FTC Case"). As Judge Iain Johnston noted in denying a motion for judgment on the pleadings in the Ag Class Case, the founder of the company, John Deere, "would be deeply disappointed in his namesake corporation" for undermining owners' ability to repair their own equipment.[2] The

---

[2] *In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 870 (N.D. Ill. 2023).

same is true for C&F equipment. Deere's anticompetitive conduct must be stopped, and those who have suffered economic harm as a result are entitled to redress under the antitrust laws.

## I.      NATURE OF THE ACTION

11.     Plaintiff seeks damages and injunctive relief on behalf of itself and all other similarly situated persons and entities in the United States who, during the period of May 14, 2022 to the present (the "Class Period"), purchased Restricted Deere C&F Repairs, or Deere C&F Parts in connection with Restricted Deere C&F Repairs, from Defendant Deere or from a Deere Dealer.

12.     Plaintiff brings this action for injunctive relief and treble damages under Sections 1 and 2 of the Sherman Act and demands a trial by jury. Plaintiff alleges that Deere's unlawful business practices have inflated the costs of Restricted Deere C&F Repairs and Deere C&F Parts and degraded Plaintiff's and members of the Class's ability to obtain timely repairs for the equipment they own.

13.     Deere is a leading manufacturer of C&F equipment in the United States. Deere distributes its C&F equipment in the United States through a network of dealers who, in addition to selling equipment, provide repair services and sell parts to customers. Deere controls its dealers by appointing dealers to act as "authorized dealers" (i.e., Deere Dealers), overseeing changes to dealer business structures, and requiring that Deere Dealers actively promote Deere products and policies. Deere Dealers employ thousands of technicians who, among other things, diagnose and repair Deere C&F equipment.

14.     Deere C&F equipment is used in projects of all sizes, including for digging, moving, and hauling, as well as for building roads and logging and hauling timber. Each piece of equipment is designed to last for 10-20 years, or longer with proper maintenance, and is expensive,

with some pieces costing hundreds of thousands of dollars. Deere C&F equipment requires intensive capital investment and substantial maintenance and repair work over its lifespan.

15. Owners of construction and forestry operations, as well as their private and public clients, benefit from completing projects as efficiently as possible. Every wasted moment waiting for repairs comes with significant costs, as equipment remains sidelined, alternative equipment must be rented, and workers stand by or are reassigned to other tasks. These costs could be avoided if Deere C&F equipment owners were able to fix their equipment or use an IRP instead of waiting for a Deere Dealer to perform Restricted Deere C&F Repairs.

16. Historically, maintenance and repairs of C&F equipment were largely mechanical in nature, so the work to maintain or repair equipment could be done by individuals with the requisite mechanic skills, including equipment owners. Self-repair or using an IRP can decrease costs and turnaround times for repairs. In the past, all customers benefited from the competition that Deere Dealers faced from IRPs and customers opting to self-repair, because Deere Dealers needed to offer lower prices or faster service to win business.

17. In recent decades, Deere has increasingly computerized its C&F equipment. Computerized components, known as electronic control units ("ECUs"), now control and monitor many functions on the equipment, so repairing machines is no longer entirely mechanical. Instead, repairing equipment often requires using the Deere repair tool to communicate with various ECUs onboard a Deere machine to diagnose and/or execute a repair.

18. Deere designs its Deere C&F equipment so that diagnosing and executing certain repairs requires the Fully Functional Tool that is licensed exclusively to Deere Dealers and withheld from owners and the IRPs. Deere's first software-based repair tool, Service ADVISOR, was licensed exclusively to Deere Dealers. To effectuate repairs that required access to Service

6

ADVISOR, a Deere Dealer technician needed Deere authentication to personally connect their laptop to a piece of Deere C&F equipment, allowing the technician to communicate with onboard software and hardware systems, check for updates, recognize and clear error codes, and program ECUs. Only Deere Dealer technicians could access the codes necessary to diagnose the faults with the Deere C&F equipment and effect the necessary Restricted Deere C&F Repairs. In effectuating such repairs, the Deere Dealers use only Deere C&F Parts.

19.     Only Deere has access to the information needed to develop a Fully Functional Tool that can be used with Deere C&F equipment. Accordingly, Deere controls who can perform many C&F equipment repairs. In concert with its co-conspirator Deere Dealers, Deere exclusively licenses its Fully Functional Tool to dealers within the authorized dealer network. Deere maintains Deere Dealers' exclusive access to the Fully Functional Tool through complex encryption technology. Therefore, for many essential repairs (i.e., Restricted Deere C&F Repairs), Deere C&F equipment can only be repaired at a Deere Dealer or by a Deere Dealer's authorized technician.

20.     Deere's anticompetitive scheme first came to light when farmers began to voice concerns about Deere's repair restrictions on certain large Deere agriculture equipment. Despite those concerns, Deere opted to maintain its repair monopoly and, instead of fixing the problem, released a series of inferior repair tools designed to placate Deere's agriculture and C&F equipment customers. Deere has introduced two iterations of these tools, first the "Customer Service ADVISOR" and then the "John Deere Operations Center PRO Service." Despite their names, and the contemporaneous representations that Deere made about the functionality of these tools, both failed to replicate the range of functionality of the Fully Functional Tool, which Deere continued to exclusively license to Deere Dealers. To date, Deere still has not made a true equivalent of the Fully Functional Tool available to Deere C&F equipment owners or IRPs. In addition, only Deere

7

and its co-conspirator Deere Dealers know which repairs can be diagnosed by its inferior products versus the Fully Functional Tool.

21.     Deere has been an outspoken advocate of the right of Original Equipment Manufacturers ("OEMs") like Deere to control the repair aftermarkets for the products that they sell. Deere and the Deere Dealers have thus consistently fought against "right to repair" legislation that would require Deere to license the Fully Functional Tool (or its equivalent) to its customers.

22.     To obfuscate the anticompetitive nature of its scheme, Deere has raised unfounded environmental concerns, wrongly invoking the federal Clean Air Act ("CAA") to justify its refusal to license the Fully Functional Tool (or its equivalent) to owners and thereby continuing to require that Deere Dealers have the exclusive right to diagnose and perform all restricted repairs using only Deere-branded parts (i.e., Deere C&F Parts).

23.     Because owners lack access to the Fully Functional Tool, Deere C&F equipment owners can only obtain Restricted Deere C&F Repairs from Deere Dealers. And because Deere Dealers only use Deere C&F Parts for such repairs, C&F equipment owners are forced to purchase Deere C&F Parts to effectuate any such repairs. Thus, by restricting licensing of the Fully Functional Tool to Deere Dealers, Deere restricts the overall output of repair services, enabling Deere Dealers to charge supracompetitive prices for Restricted Deere C&F Repairs. In this anticompetitive scheme, Deere itself is also able to reap supracompetitive profits from Deere Dealers' sales of Deere C&F Parts because Deere and Deere Dealers are insulated from competition from actual or potential third-party manufacturers of replacement parts.

24.     What would otherwise be competitive aftermarkets for Restricted Deere C&F Repairs are instead subject to monopolies that enrich Deere and the Deere Dealers, who share in windfall profits at the expense of C&F equipment owners. Consequently, Deere C&F equipment

owners have suffered and continue to suffer harm from higher prices for Restricted Deere C&F Repairs and Deere C&F Parts, as well as increased wait times as compared to repairs that may be performed in-house or by IRPs, leading to additional costs.

## II.     JURISDICTION AND VENUE

25.     Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) and seeks to recover damages and secure injunctive relief against Defendant for violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2). Plaintiff also seeks attorneys' fees, costs, and other expenses.

26.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

27.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the Class are citizens of a state different from Defendant.

28.     This Court has personal jurisdiction over Defendant because Deere transacts business in Illinois, maintains its corporate headquarters in Illinois, and has engaged in anticompetitive conduct in Illinois.

29.     Venue is proper in this district pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. § 1391(b), (c) and (d) because a substantial portion of the affected interstate commerce discussed below has been carried out in this district, and because Defendant Deere is licensed to and does business in this district and has transacted business in this district.

9

### III. PARTIES

#### A. Plaintiff

30. Plaintiff Christy Webber & Company operates a full-service commercial, municipal, and residential landscaping service. Christy Webber is located in Chicago, Illinois. Christy Webber has purchased or leased nearly 50 pieces of Deere C&F equipment, including but not limited to wheel loaders (models 304K, 324K, and 524L), track loaders (models 326E, 333G, and 325G), excavators (models 30G, 50G, 317G, and 33G), and skid steers (models 324G, 330G, and 312GR). Each piece of equipment was purchased or leased from West Side Tractor Sales Co. ("West Side"), a Deere Dealer.

31. While the exact prices vary, every piece of Deere C&F equipment purchased by Christy Webber can cost tens of thousands of dollars. Christy Webber purchased its Deere C&F equipment with the goal of maintaining a comprehensive fleet of products through a single manufacturer. The high costs associated with an initial equipment purchase make it impractical to switch to a different piece of C&F equipment offered by a Deere competitor. Accordingly, once Christy Webber committed to Deere for its fleet, it was locked in.

32. Christy Webber purchased its Deere C&F equipment with the expectation that it could choose to repair its equipment itself or utilize the repair services of its preferred IRP or Deere Dealer.

33. Christy Webber employs a team of mechanics who, whenever possible, repair its nearly 50 pieces of Deere C&F equipment in-house. Due to the anticompetitive restraints detailed herein, the scope of Christy Webber's ability to perform repairs in-house has been limited, and many, if not all, of the repairs Christy Webber performs in-house are purely mechanical in nature. Purely mechanical repairs are simple repairs (e.g., changing an air filter) that do not require the Fully Functional Tool.

10

34. West Side's technicians have routinely informed Christy Webber employees that various repairs for their Deere C&F equipment require access to the Fully Functional Tool, which is only available to Deere Dealers like West Side and not to customers like Christy Webber. Consequently, Christy Webber is compelled to rely on West Side for Restricted Deere C&F Repairs and directly purchases those repair services and any associated Deere C&F Parts required to effect such repairs from West Side.

35. For all such repairs, West Side only utilizes Deere C&F Parts and does not offer Christy Webber the option to have repairs completed using non-Deere replacement parts. Christy Webber has never been able to utilize an IRP to perform such repairs on its Deere C&F equipment because IRPs lack access to the Fully Functional Tool.

36. Christy Webber was the first purchaser outside the conspiracy for the Restricted Deere C&F Repairs and the associated Deere C&F Parts it purchased from West Side.

37. Repairs from West Side are both time consuming and costly. Turnaround times at West Side are slower than if Christy Webber could perform the same repairs in-house. The long turnaround times for diagnosis and repairs negatively impact Christy Webber's business. For example, the long wait times on repairs and replacement parts often force Christy Webber to rent additional pieces of Deere C&F equipment from West Side to complete client jobs.

38. Christy Webber is forced to use West Side because West Side's technicians have access to a Fully Functional Tool, which Deere will not license to either Christy Webber or any IRPs. As just one example, in June 2023, Christy Webber's Deere 324K Loader displayed a complete loss of bucket and boom hydraulic functions. Christy Webber's in-house mechanics could not diagnose the issue to perform the necessary repairs because they lacked access to the Fully Functional Tool; instead, Christy Webber was forced to retain West Side solely because

11

West Side, as a Deere Dealer, had access to the Fully Functional Tool. With the Fully Functional Tool, West Side was able to clear the error codes and repair the equipment, using Deere C&F Parts. For this repair project, Christy Webber paid West Side $1,262.50 for labor and $747.39 for replacement parts. The bill also included $432.00 for mileage, $37.87 in miscellaneous materials, and $18.93 in environmental fees, bringing the total invoice, with tax, to $2,502.29. If Christy Webber had access to a Fully Functional Tool, it would have spent less money and time diagnosing and performing the repair and purchasing replacement parts.

39. Christy Webber cannot forego using West Side for Restricted Deere C&F Repairs. By way of further example, in or around the summer of 2025, Christy Webber's Deere 333G Compact Track Loader was malfunctioning. Christy Webber could not diagnose the problem because it lacked access to the Fully Functional Tool. As a result, Christy Webber was forced to call in West Side. A West Side technician traveled to Christy Webber's facility, using the Fully Functional Tool to diagnose the problem. The West Side technician informed Christy Webber that the Track Loader would need to be taken to West Side's facility for repair. Christy Webber was forced to pay both for the technician's travel time and labor, as well as for the cost of transporting the Track Loader to West Side. But even then, the repairs were not timely performed. After several months, West Side informed Christy Webber that the Track Loader required a new engine, which would cost $57,000, or roughly 75% of the original purchase price.

40. After receiving that diagnosis and estimate, Christy Webber sought a second opinion and bought a single John Deere Operations Center PRO Service license from Deere in an attempt to conduct a diagnosis itself. This was not effective. The John Deere Operations Center PRO Service software did not suggest that the Track Loader was suffering from any engine problems and was unable to pinpoint the cause of the malfunction. Accordingly, not only was

12

Christy Webber unable to diagnose the problem with the Track Loader using the Deere customer repair tool, Christy Webber's only options were to use West Side to perform the needed repairs or not to perform the repairs at all.

41. During the Class Period, Christy Webber purchased hundreds of thousands of dollars in Restricted Deere C&F Repairs and Deere C&F Parts directly from Deere Dealer West Side. The costs of the Restricted Deere C&F Repairs and Deere C&F Parts purchased by Christy Webber were artificially inflated due to Deere's, and its co-conspirator Deere Dealers' (including West Side's), illegal scheme. As a result of the antitrust violations alleged herein, Christy Webber has suffered monetary loss and antitrust injury.

**B.      Defendant and Co-Conspirators**

42. Defendant Deere & Company is a corporation organized under Delaware law and headquartered in Moline, Illinois. Deere is a manufacturer of construction and forestry equipment and other machinery and conducts business throughout the United States and the world. John Deere Construction & Forestry Company is a wholly-owned subsidiary and division of Deere also headquartered in Moline, Illinois. "Defendant," as used in this complaint, includes the named Defendant's predecessors, affiliates, and wholly-owned or controlled subsidiaries who have sold Restricted Deere C&F Repairs and Deere C&F Parts directly or through affiliated Deere Dealers to purchasers in the United States during the Class Period.

43. According to Deere's 2025 10-K filing with the United States Securities and Exchange Commission (hereinafter, "Deere 2025 10-K"), Deere lists four different business segments: (1) Production & Precision Agriculture; (2) Small Agriculture & Turf; (3) Construction & Forestry; and (4) Financial Services. The Deere 2025 10-K notes that Deere achieved $45.7 billion in net sales and revenues across these four business units, with C&F making up 25% (roughly $11.4 billion).

13

44. The Deere 2025 10-K lists the following types of C&F equipment that Deere manufactures: backhoe loaders, crawler dozers and loaders, skid steers, four-wheel-drive loaders, compact wheel loaders, excavators and compact excavators, equipment used in timber harvesting, road building and road rehabilitation equipment, and articulated dump trucks and motor graders.

45. Deere's co-conspirators (the Deere Dealers) are the independently-owned dealerships that have agreements with Deere granting them the rights to sell new Deere C&F equipment and Deere C&F Parts and perform Restricted Deere C&F Repairs.

46. Deere's 2025 10-K describes its expansive network of authorized dealerships: "Through the U.S. and Canada, we market products to approximately 2,050 independent dealer locations. Of these, approximately 1,600 sell agricultural equipment, while approximately 450 sell construction, earthmoving, material handling, roadbuilding, compact construction, and/or forestry equipment. In addition, roadbuilding equipment is sold at approximately 100 roadbuilding-only locations that may carry products that compete with our construction, earthmoving, material handling, and/or forestry equipment. Turf equipment is sold at most John Deere agricultural equipment locations, a few construction and forestry locations, and about 260 turf-only locations."[3]

47. Many Deere Dealers sell both agriculture and C&F equipment. For example, Ag-Pro describes itself as the "largest John Deere Dealer network" in the United States with "more than 80 [] locations" throughout Florida, Georgia, Kentucky, Ohio, South Carolina, and Tennessee. Ag-Pro sells both Deere agriculture and C&F equipment and "offers access to a wide inventory of John Deere parts along with expert service and maintenance, ensuring your equipment stays productive year-round."[4]

---

[3] Deere 2025 10-K at 8.
[4] Ag-Pro, *Browse Our Locations*, https://www.agprocompanies.com/locations.

48. Many of the other co-conspirator Deere Dealers are large enterprises with numerous locations. For example, West Side, the Deere Dealer from whom Christy Webber purchased their C&F equipment, operates 11 locations throughout Illinois and Indiana. West Side bills itself as "the authorized, full-service John Deere construction & forestry equipment distributor throughout Northern Illinois and Indiana."[5] Another large Deere Dealer, McCoy Construction & Forestry ("McCoy"), has 25 locations throughout the Midwest.

49. All Deere Dealers, including West Side, are co-conspirators because they entered into materially uniform contracts with Deere in which the Deere Dealers agreed to restrict customer and other third-party access to the Fully Functional Tool, including Case and Contact Management System ("CCMS")/Dealer Technical Assistance Center ("DTAC"), payload files, calibrations, part-pairing functions, and related repair resources. CCMS and DTAC are online repositories of information regarding diagnosis and repairs of Deere equipment and allow Deere Dealers to submit tickets to escalate complex repairs and questions. Pursuant to their substantially similar agreements with Deere, the co-conspirator Deere Dealers specifically agreed not to provide these resources to C&F equipment owners or IRPs. The Deere Dealers also agreed to use only Deere-manufactured replacement parts to repair C&F equipment.

## IV. INTERSTATE TRADE AND COMMERCE

50. During the Class Period, Deere and the Deere Dealers sold Restricted Deere C&F Repairs and Deere C&F Parts in the United States. The sale of the Restricted Deere C&F Repairs and Deere C&F Parts flowed in and substantially affected interstate commerce. Defendant and its co-conspirators controlled the markets for Restricted Deere C&F Repairs and Deere C&F Parts in the United States during the Class Period.

---

[5] West Side Tractor Sales Co., *Construction Equipment Dealer*, https://westsidetractorsales.com/.

51. Defendant's wrongdoing described herein substantially affected interstate trade and commerce in the United States and harmed persons who purchased Restricted Deere C&F Repairs and Deere C&F Parts.

## V. DEERE'S AND THE CO-CONSPIRATORS' MARKET POWER IN THE RELEVANT MARKETS

52. The antitrust violations alleged in this Complaint occur in the aftermarket for Restricted Deere C&F Repairs (and concern other relevant markets, as alleged below).

53. The foremarket is the market for C&F equipment. Deere is a leading manufacturer of C&F equipment sold in the United States. Deere C&F equipment includes general construction (e.g., excavators, backhoes, dozers, dump trucks), compact construction (e.g., skid steers, compact excavators, compact loaders), forestry (e.g., wheeled and tracked harvesters, feller bunchers, skidders), and roadbuilding (e.g., asphalt pavers, compactors, milling machines, rollers).

54. Competition in the foremarket for C&F equipment does not constrain Deere's anticompetitive conduct in the aftermarket for Restricted Deere C&F Repairs. Because OEMs like Deere do not disclose, or otherwise obfuscate any such disclosures about the scope of, and costs associated with, such restricted repairs, not only are C&F equipment owners unable to, at the time of purchase, reliably estimate lifecycle repair costs of owning Deere C&F equipment, they are unable to compare such estimated costs of ownership against the costs of owning C&F equipment sold by other OEMs. In addition, other manufacturers in the foremarket have followed Deere's playbook in similarly adopting policies and practices restraining owners' ability to repair their equipment.

55. Given the substantial switching costs after purchase (compounded by owners such as Christy Webber striving to gain efficiencies through sole-sourcing C&F equipment from one OEM), C&F owners are locked into repair aftermarkets for equipment that they own.

16

A.      **Barriers to Entry and Switching Costs**

56.      Deere has locked in the Deere C&F equipment owners through two distinct processes. Deere C&F equipment owners cannot account for their "all-in costs" or the "lifecycle cost" for their Deere C&F equipment—i.e., the total cost of ownership of the piece of equipment, which includes the estimated costs of repairs and parts over time. This is because neither current nor prospective Deere C&F equipment owners understand the range of repairs that they can perform themselves (or through an IRP) and the range of Restricted Deere C&F Repairs that must be performed by a Deere Dealer because Deere does not disclose this information. This lack of information is exacerbated by Deere's repeated changes in repair policies, about which Deere has made representations that have been shown to be untrue. Actual and potential Deere C&F equipment owners' ability to estimate total lifecycle costs for Deere C&F equipment is therefore further frustrated by these repeated changes and misrepresentations about the effect of those changes.

57.      Additionally, the Deere C&F equipment owners face significant switching costs— much Deere C&F equipment costs tens of thousands of dollars and is not so easily replaced. Owners like Christy Webber also prefer to maintain a fleet entirely or primarily from one brand to facilitate interoperability and knowledge among maintenance technicians, making switching to another manufacturer especially burdensome.

58.      As detailed below, Deere has repeatedly utilized a bait-and-switch strategy in an effort to quell public uproar about restricted repairs. Pursuant to this strategy, Deere has released revised versions of its customer repair tool, only for owners to discover that these tools were half-measures. While these revised, publicly available tools created the appearance that Deere was now allowing what had been restricted repairs on Deere C&F equipment to be performed by owners and IRPs, in reality Deere was continuing to withhold the dealer-level functions necessary to

17

perform these restricted repairs. Thus, pursuant to this strategy, Deere offered Deere C&F equipment owners licenses for incomplete and non-fully functional customer-facing repair tools that did not and do not operate or function the same way as the Fully Functional Tool that Deere continued to license exclusively to Deere's Dealers. Deere's repeated bait-and-switch efforts demonstrate that Deere has never been forthcoming with Deere C&F equipment owners about what could or could not be repaired by themselves or IRPs versus a Deere Dealer, inhibiting Deere C&F equipment owners' ability to estimate total lifecycle costs of owning a piece of Deere C&F equipment.

### B. Restricted Deere C&F Repairs

59. The relevant market is the aftermarket for Restricted Deere C&F Repairs, which by definition can only be performed by a Deere Dealer who has licensed the Fully Functional Tool. Restricted Deere C&F Repairs include the diagnosis, maintenance, and repair services for Deere C&F equipment that require access to the Fully Functional Tool, including Deere-controlled information such as ECU programming or reprogramming, DTC clearing, payload-file installation, part-pairing, tests, calibrations, and CCMS/DTAC solutions.

60. At all relevant times, Deere has had, and continues to have, market and monopoly power in the Restricted Deere C&F Repairs aftermarket. Deere and its co-conspirator Deere Dealers possess 100% market share in the Restricted Deere C&F Repairs aftermarket, because Deere controls the ability to exclude competition by restricting access to the Fully Functional Tool and, thus, only Deere Dealers can perform said repairs.

61. The Fully Functional Tool is necessary to perform any complete diagnosis of C&F equipment as well as many repairs and maintenance services for Deere C&F equipment. The Fully Functional Tool is restricted to the Deere Dealers, and no other tool, including those offered by third parties, can perform the same functions as the Fully Functional Tool. Customer-facing repair

18

tools offered by Deere lack the full functionality of the Fully Functional Tool. In restricting access of this necessary repair tool to the Deere Dealers, Deere controls who can provide Restricted Deere C&F Repairs. In particular, Deere prevents IRPs or owners of Deere C&F equipment from competing to supply any of the Restricted Deere C&F Repairs.

62. Deere's and the Deere Dealers' market power is protected by substantial barriers to entry. Deere exercises complete control over who can become a Deere Dealer and, therefore, over who can obtain access to the Fully Functional Tool to compete for the supply of Restricted Deere C&F Repairs. Because Deere exclusively licenses the Fully Functional Tool to Deere Dealers, IRPs and C&F equipment owners cannot enter the aftermarket for Restricted Deere C&F Repairs.

63. Deere segments its repair tools by its various business units. Specifically, Deere C&F equipment owners (or their selected IRPs) require a specific license to perform repairs on the Deere C&F equipment versus Deere agriculture equipment. Accordingly, a repair tool designed for use with agriculture equipment cannot be substituted for a repair tool designed for use with C&F equipment, and vice versa.

**C. Replacement Parts for Deere C&F Equipment**

64. Another relevant market is the market for the supply of replacement parts for Deere C&F equipment needed to effectuate Restricted Deere C&F Repairs.

65. Deere Dealers only use Deere C&F Parts in connection with Restricted Deere C&F Repairs. Because the Fully Functional Tool is restricted to the Deere Dealers, C&F owners must visit a Deere Dealer to obtain Restricted Deere C&F Repairs. And because those Deere Dealers only utilize Deere-branded parts, C&F equipment owners obtaining Restricted Deere C&F Repairs must, to the extent a repair requires replacement parts, also purchase Deere C&F Parts, which are typically priced at a premium.

19

66. Third-party replacement parts are, or would be in a competitive marketplace, significantly cheaper than Deere C&F Parts. Nevertheless, the restrictions forcing Deere C&F equipment owners to utilize a Deere Dealer for Restricted Deere C&F Repairs also allow Deere and the Deere Dealers to maintain high margins and extract supracompetitive profits from sales of Deere C&F Parts.

67. Accordingly, because Deere had, and continues to have, market power over Restricted Deere C&F Repairs, Deere has the power to force owners to purchase Deere-branded replacement parts for Deere C&F equipment (i.e., Deere C&F Parts) needed to effect such repairs.

**D.     The Fully Functional Tool**

68. Another relevant product market is the market for the Fully Functional Tool. The Fully Functional Tool includes a license for, and access to, full dealer-level diagnostic and repair functionality necessary to perform restricted repairs on Deere C&F equipment, including Service ADVISOR/Operations Center PRO Service dealer-level functionality, CCMS/DTAC, payload files, ECU programming and reprogramming, DTC clearing, part-pairing, tests, and calibrations. The Fully Functional Tool is now, and has always been, available exclusively to Deere Dealers.

69. At all relevant times, Deere has had, and continues to have, market and monopoly power in the market for the Fully Functional Tool, because Deere completely controls licenses for the Fully Functional Tool and only provides licenses to Deere Dealers within its authorized network. As Deere is the only supplier of the Fully Functional Tool, it holds a 100% market share and shares that monopoly control only with the Deere Dealers.

70. Licenses to customer-facing Deere repair tools or third-party diagnostic tools are not a substitute for a license to the Fully Functional Tool because none of those tools can provide the full range of capabilities associated with the Fully Functional Tool and, specifically, do not allow owners or third-party IRPs to perform any of the Restricted Deere C&F Repairs. As a result,

20

Deere C&F equipment owners cannot and do not rely on third-party replacement tools due to their comparatively limited capability.

71. C&F equipment owners must retain a Deere Dealer to access the Fully Functional Tool. C&F equipment owners are thus forced to obtain Restricted Deere C&F Repairs from Deere Dealers at higher costs and with longer wait times because those repairs require access to the Fully Functional Tool. In addition, because Deere Dealers only use Deere-branded replacement parts in providing repair services, C&F equipment owners obtaining Restricted Deere C&F Repairs must, to the extent a repair requires one or more replacement parts, also purchase higher-cost Deere C&F Parts.

### E. Geographic Market

72. The relevant geographic markets for each of the foregoing relevant markets are as broad as the United States. Deere publishes uniform list prices, or MSRPs, for new equipment on a nationwide basis, via www.deere.com's online store, price sheets, and dealer catalogs. Non-road diesel equipment like construction and forestry equipment is also uniformly subject to the same federal regulations, including the Environmental Protection Agency's emissions regulations.

## VI. FACTUAL ALLEGATIONS

### A. The Construction & Forestry Industry

73. Americans rely on construction equipment for a myriad of reasons, including but not limited to everyday tasks as well as building roads, homes, and commercial buildings. Forestry equipment is also critical to American infrastructure, as it is used to harvest and cultivate timber for all manner of end uses, from lumber for construction projects, to furniture and flooring, to wood fiber for paper, cardboard, and packaging materials. Forestry equipment also allows companies to sustainably manage America's vast forestlands, reducing wildfire risks and improving the health of a forest ecosystem.

21

74. The market for construction and forestry equipment in the United States is substantial. In 2024, the total domestic market for construction equipment was estimated to be anywhere from $27 to $44 billion. Meanwhile, the U.S. forestry equipment market has been estimated to be around $11.5 billion dollars as of 2026. Deere is a significant player in the construction and forestry markets, with over $11 billion in revenue. This, in turn, yields massive profits: the Deere 2025 10-K reveals that Deere's Construction & Forestry segment made $1.03 billion in operating profits that reporting year.

**B.     Deere & Company Background**

75. Deere & Company originated in the mid-1800s as a manufacturer of agriculture implements and machinery. Deere has grown to possess a dominant position in that market, becoming the largest manufacturer of agriculture equipment in the United States.

76. In the 1950s, Deere saw an opportunity for the company's products to be adapted to the construction and forestry markets and began to invest in facilities to manufacture construction and forestry machinery separate from their traditional agriculture manufacturing operations.

77. Over the subsequent decades, this sector of Deere's business grew. In 1974, Deere opened John Deere Davenport Works, which still today is the "cornerstone of John Deere's construction and forestry equipment production," "producing a wide range of powerful machines that help build and maintain infrastructure and manage forests."[6]

78. Today, Deere manufactures a large fleet of C&F equipment. On the construction side, this includes, but is not limited to, excavators, front and tracked loaders, backhoes, and graders. Deere also produces a Wirtgen brand of roadbuilding products including milling

---

[6] John Deere, *Davenport Works*, https://about.deere.com/en-us/locations/factories/davenport-works.

22

machines, pavers, compactors, rollers, and other road construction equipment. As to forestry, Deere's production includes, but is not limited to, log loaders, lumber harvesters, forwarders, and skidders. As indicated in the Deere 2025 10-K, this equipment is all sold under Deere's "Construction and Forestry" business unit. Additionally, the Deere C&F equipment is easily recognizable from other business units—Deere C&F equipment is typically painted yellow and black, whereas Deere agriculture equipment is painted green.

79.     Deere C&F equipment is an expensive capital expenditure for customers. For example, a new construction-grade excavator and a new log loader each cost hundreds of thousands of dollars, with significant additional maintenance and repair expenses over the equipment's lifespan of at least 10-20 years. Standard mechanical maintenance includes regular oil changes, filter replacements, and hydraulic system checks. Given the hard-wearing conditions that C&F equipment operates in, issues requiring both minor and major repairs also regularly (if unpredictably) come up. Hydraulic hosing develops cracks or leaks from the pressure inside and the constant exposure to dirt and debris. Loose or frayed wiring or malfunctioning sensors can prevent the engine from starting, and tracks can be too loose or too tight or have worn-out track chains needing replacement. Unexpected major repairs can cost thousands of dollars, and over the lifespan of a machine can easily reach tens of thousands of dollars.

80.     These pieces of equipment have become increasingly technologically complex. Modern equipment has replaced many mechanical functions with electronic controls. According to Deere, "we have delivered a portfolio of construction, roadbuilding, and forestry products with precision technology solutions. Our smart solutions such as SmartWeigh™, Smart Grade™, machine and system automation, and the John Deere Operations Center™, are designed to allow

23

customers to complete more functions with fewer inputs, reduce rework and guesswork, and transform data into insights to allow for better decisions."[7]

81.     Deere's representations that the advanced technology integrated into Deere C&F equipment would improve operational efficiency and deliver economic benefits to owners have proven to be illusory because, in practice, the same technology substantially increased ownership and operating costs by limiting owners' ability to perform repairs and maintenance independently of a Deere Dealer, while also requiring owners to pay for expensive Deere C&F Parts. Accordingly, even to the extent that this technology produced incremental productivity gains, the economic benefit realized by those gains was significantly offset, if not exceeded, by increased repair costs, maintenance burdens, and operational disruptions such that owners have not realized the promised economic benefit.

### C.     Deere's Consolidation of the Construction & Forestry Dealer Network

82.     Deere C&F equipment is not sold directly by Deere. Instead, Deere sells its equipment to dealers who then resell to customers, i.e., the Deere Dealers. Deere C&F equipment owners, like Plaintiff Christy Webber, purchase their equipment from a Deere Dealer.

83.     In order to become a Deere Dealer for C&F equipment, a prospective dealer must receive approval from Deere and enter into a contract with Deere Construction & Forestry. The issuance of a dealer contract is subject to approval by Deere, including the sale of an existing dealership to a new owner. According to Deere, its approval is necessary to ensure prospective dealers "will have sufficient resources to adequately represent the John Deere brand and product in the marketplace."[8]

---

[7]   Deere 2025 10-K at 6.
[8]   John Deere, *Owning a Dealership*, https://www.deere.com/en/our-company/contact-us/become-a-dealer/.

84. Deere Dealers cannot obtain equipment through any independent non-Deere authorized dealership or outlet. Deere's exclusive control over equipment and parts creates an environment where the Deere Dealers are entirely dependent on Deere. In particular, the dealership agreement between Deere and the Deere Dealers requires those dealers to actively promote the sale of Deere-branded replacement parts (i.e., Deere C&F Parts). Deere does so to ensure that it can reap significant profits from its replacement parts business. As one example, at West Side, online parts ordering is integrated with John Deere's parts catalog to push customers to purchase Deere-branded parts.

85. Likewise, because Deere Dealers are the exclusive sellers of Deere C&F equipment and have exclusive access to the Fully Functional Tool, owners depend on the Deere Dealer network to perform the Restricted Deere C&F Repairs on their equipment.

86. To perform the Restricted Deere C&F Repairs on any Deere C&F equipment, a dealer must be an authorized Deere Dealer. And to become an authorized Deere Dealer, a prospective dealer must obtain Deere's approval. Deere wields this approval power selectively.

87. Over the past three decades, Deere has aggressively pushed for the consolidation of its dealer network. Beginning in the early 2000s, Deere adopted a policy favoring large dealers over smaller ones. Deere has pressured existing authorized Deere Dealers to either buy other dealerships or sell to a bigger Deere Dealer. Dealers who resist Deere's demands face the prospect of losing their "authorized dealer" status.

88. In 2009, a former owner of a Deere-affiliated dealership reported that representatives from Deere had pressured him to sell his small dealership in order for the large dealers in the area to continue to grow. Similarly, in 2021, Deere terminated the contract of Tennessee's last remaining single-store Deere dealership, Tri-County Equipment, which had

25

operated as a Deere dealership since 1977. These examples reflect a broader pattern whereby Deere forcibly pushes consolidation of its dealer network. An industry publication tracking consolidation among dealership groups noted that, "By equipment brand, John Deere remains the most aggressive when it comes to consolidating its dealers."[9]

89.     This consolidation strategy has succeeded. What was once an industry defined by single-store dealerships has transformed into a highly concentrated market where only the largest companies survive.

90.     The average Deere Dealer is now a conglomerate owning dozens of dealerships across multiple states that is careful not to encroach upon another Deere Dealer's territory. McCoy, for instance, has 25 locations across eight states and swelled to its current size after buying out eight dealerships in 2021. RDO Equipment ("RDO") manages over 75 Deere locations in 12 states, and James River Equipment ("JRE") operates 29 Deere C&F Dealerships across four Mid-Atlantic states. Additionally, United Construction and Forestry ("United") owns every Deere C&F Dealership across New England and upstate New York and also operates over 65 Deere Ag & Turf stores. Dobbs Equipment ("Dobbs") has 29 different dealership locations in Alabama, Florida, Georgia, and South Carolina, whereas Papé Machinery Construction & Forestry ("Papé") maintains 29 locations in the upper northwestern states and Hawaii.

91.     These and other large multi-state dealer companies own a substantial share of authorized Deere C&F equipment dealerships. Indeed, the combination of just six Deere Dealers, RDO, McCoy, JRE, United, Dobbs, and Papé, represents roughly 40% of the entire Deere authorized C&F dealership network.

---

[9]   Ag Equip. Intelligence, 2015 'Big Dealer' Report 3 (2015).

92.     As the large Deere Dealer companies expand their territorial footprint through acquisitions, single-store companies are disappearing. This trend reflects Deere's strategy of forced consolidation throughout its dealer network to create a captive ecosystem wherein a smaller number of competitors ensures increased compliance with Deere's anticompetitive policies concerning sales of repairs and replacement parts.

93.     In this heavily consolidated landscape, Deere C&F equipment owners confront drastically reduced choices as to where they can receive Restricted Deere C&F Repairs.

94.     Many Deere C&F equipment owners are located dozens of miles away from the closest Deere Dealer without any meaningful alternatives. For many owners, the second- and even third-closest Deere Dealers are owned by the same large company, depriving the owner of any meaningful choice for purchasing service or replacement parts. For example, in Montana, the fourth largest state by land size, there are only six Deere Dealer locations. All six are owned by RDO. So, across the entire state of Montana, Deere has effectively eliminated competition in the supply of Restricted Deere C&F Repairs by encouraging aggressive consolidation among dealers.

95.     Dealer consolidation serves Deere's interests by making it easier for Deere to actively oversee and direct the operations of nominally "independent" dealers.

96.     Deere's close oversight of its authorized dealer network allows Deere to ensure Deere Dealers continue to participate in an anticompetitive scheme to restrict owners' and IRPs' access to resources needed to perform repairs.

97.     Deere's close relationship with its Dealers is further demonstrated by the John Deere User Group ("JDUG"), an association of Deere Dealers with the goal of "fostering cooperation with one another and John Deere," and "maintaining focus on the dealership bottom

line."[10] Membership in the association provides dealers "direct access, feedback, and input" to Deere.[11] JDUG's board includes representatives from several large multi-state dealers of Deere C&F equipment, including 4Rivers Equipment, Midwest Machinery Co., and RDO, and its management organization is the North American Equipment Dealers Association ("NAEDA"), an organization that includes many Deere Dealers among its members and is at the heart of fighting against right to repair (discussed further below). Deere itself is also involved in JDUG. JDUG's annual dealers conference is sponsored and produced by Deere, and Deere representatives can become non-voting members of the association.

98. Diane Benck, General Operations Manager and Owner at West Side, serves on the Board of Directors of Associated Equipment Distributors ("AED") Foundation. RDO, the only authorized Deere Dealer in Montana, is also a member of AED. AED is a trade association "representing companies that sell, rent, service, manufacture construction, agricultural farm, mining, energy, material handling and industrial equipment."[12] In testimony on behalf of AED before the U.S. House of Representatives Committee on Small Business, Ms. Benck reiterated concerns raised by AED in a 2022 report, explaining that a shortage of skilled technical workers in the United States "hinders growth and economic opportunity" and "creates inefficiencies."[13]

99. In that report, AED emphasized the negative "chain of effects" that delays in repair services have on C&F equipment owners' businesses and the broader economy. Absence of crucial equipment due to slow turnaround times "causes a reduction in the number of goods sent to the

---

[10] JDUG, *Who We Are*, https://www.jdug.net/; JDUG, *Value of Membership*, https://www.jdug.net/value-of-membership.

[11] JDUG, *Value of Membership*, https://www.jdug.net/value-of-membership.

[12] *Skill, Upskill, and Reskill: Analyzing New Investments in Workforce Development*, Hearing Before the H. Comm. on Small Business, 117th Cong. (March 31, 2022), https://www.congress.gov/117/chrg/CHRG-117hhrg46948/CHRG-117hhrg46948.pdf.

[13] *Id.*

28

market, and consequently the revenue generated from that transaction . . . In the economy, a shortage of goods negatively affects the equilibrium price, thus affecting the consumer."[14] Ironically, neither AED nor Ms. Benck mentioned that the real bottleneck in receiving the Restricted Deere C&F Repairs is the agreement between Deere and the Deere Dealers to restrict access to the Fully Functional Tool and steer Deere C&F equipment owners to the Deere Dealers. But for that anticompetitive agreement, Deere C&F equipment owners would receive quicker repair services from IRPs or, in the alternative, would repair their own equipment.

100.    Organizations like JDUG, NAEDA, AED, and other associations (discussed below) help Deere and the Deere Dealers maintain dealer coordination by cooperating and disseminating information to ensure enforcement and compliance with Deere's anticompetitive repair policies.

**D.      Deere Continually Fails to Provide Access to the Fully Functional Tool**

101.    Prior to the introduction of ECUs into Deere C&F equipment, owners had three meaningful choices: they could repair their own equipment, obtain repair services from IRPs, or, at their own discretion, select a Deere Dealer. This was true for all repairs.

102.    But, as Deere made its C&F equipment increasingly computerized, diagnosing problems and repairing equipment increasingly requires software tools that can interact with onboard computer systems. Preceding and throughout the Class Period, Deere has restricted access to the Fully Functional Tool. Despite making repeated representations to the contrary, Deere only offers the public an expensive license to an inferior tool.

103.    Pieces of Deere C&F equipment are highly complex machines that rely upon computers and related software to function. While each piece of equipment has different uses,

---

[14]    AED Foundation, *Identifying the Impact of the Technician Shortage on the US Economy*, https://aedfoundation.org/impact-of-the-technician-shortage-on-the-u-s-economy/.

different components, and may require unique parts, all machines contain one or many ECUs that use software code to help the machine function properly. By design, equipment containing ECUs cannot be operated without computers and related software code.

104. All types of Deere C&F equipment also contain various sensors throughout, which are constantly monitored by ECUs on the machine. Some pieces of Deere C&F equipment contain hundreds of these sensors. If a sensor malfunctions or discovers an error, the equipment may display an error code (referred to as a diagnostic trouble code, or "DTC"). Until the issue is resolved and the error code cleared, the equipment may not function as intended. Once the malfunction behind an error code is diagnosed and the designated repair is completed, the code can be cleared, and the machine can return to normal function.

105. Deere deliberately designed its Deere C&F equipment so that both diagnosis and completion of the indicated repairs require access to the Fully Functional Tool. Moreover, prior to and throughout the entire Class Period, accessing proprietary diagnostics and repair tools such as CCMS and DTAC requires a sign-on credential called an "XiD." These credentials are maintained by Deere. Each active XiD is associated with a specific, current employee at an authorized Deere Dealer, so IRPs and equipment owners cannot and have never been able to obtain XiDs. Indeed, Deere disables XiDs within just hours of a technician ending their employment with a Deere Dealer. Because IRPs and equipment owners cannot obtain XiDs with the incomplete repair tools discussed further below, they are cut off from accessing the Fully Functional Tool.

i. **The Advent of the Fully Functional Tool and the Conspiracy to Restrict Access to It**

106. Because of the integration of ECUs and sensors throughout different types of C&F equipment, a significant volume of repairs require a Fully Functional Tool, which is uniquely capable of clearing error codes and restoring equipment to working order.

107. Several years ago, Deere first introduced its Fully Functional Tool, known as "Service ADVISOR," and made it available exclusively to Deere Dealers in its authorized network.

108. Service ADVISOR allowed technicians to access a number of critical repair tools. Specifically, with Service ADVISOR, technicians at Deere Dealers can perform diagnostic tests, identify and clear error codes signaling, calibrate ECUs, access and install customized ECU software code (called "payload files"), and access diagnostic and troubleshooting information directly from Deere, through CCMS and DTAC. CCMS and DTAC complement Service ADVISOR by offering technicians known solutions to complex problems and a help desk where technicians can submit problems to Deere engineers.

109. Deere describes Service ADVISOR as a tool used by John Deere dealerships capable of providing technical and mechanical support for technicians and service managers through the use of a laptop computer and providing symptom-based diagnostics information, specific machine information, and electronic technical information.

110. Since its introduction, Deere has exclusively licensed Service ADVISOR to co-conspirator Deere Dealers, who, consistent with Deere corporate policy, refuse to allow any third parties, including owners, access to the Fully Functional Tool without also agreeing to have their equipment repaired by such Deere Dealer using only Deere-branded parts.

111. Deere has never licensed (or otherwise made available) Service ADVISOR, or any other equivalent, to either Deere C&F equipment owners or IRPs.

112. Deere also ensures that co-conspirator Deere Dealers maintain exclusive control over the Fully Functional Tool through its agreements with the Deere Dealers. Those agreements specifically prohibit: (a) the sublicensing or use of the Fully Functional Tool by any entity other

31

than the authorized Deere Dealer; and (b) using the Fully Functional Tool to diagnose problems with Deere C&F equipment, but allowing owners to perform any of the Restricted Deere C&F Repairs themselves or at an IRP. The Deere Dealer agreements also forbid Deere Dealers from externally sharing service manuals or repair software such as Service ADVISOR.

113. These same restrictions exist in all of its agreements with Deere Dealers and such terms are non-negotiable. By agreeing to such terms, each Deere Dealer implicitly understands that other Deere Dealers will likewise be bound to similar terms requiring them to maintain exclusive control over the Fully Functional Tool within the authorized dealer network and not allow owners or IRPs to access the Fully Functional Tool needed to perform Restricted Deere C&F Repairs.

114. These non-negotiable restrictions serve the Deere Dealers' interests by preventing competition to provide the Restricted Deere C&F Repairs from anyone outside the Deere-controlled network, so long as all Deere Dealers abide by these contractual restrictions regarding the use of the Fully Functional Tool. For example, if any Deere Dealer were to deviate from their contractual obligations by allowing their customers to freely access the Fully Functional Tool, such "cheating" could allow the cheating Deere Dealer to poach customers from other compliant Deere Dealers.[15] However, because all Deere Dealers are bound by the same restrictive agreements, any Deere Dealer who undermines Deere's anticompetitive scheme risks losing its dealership authorization.

115. The restrictions serve Deere's interests as well. In the Ag Class Case, Judge Johnston found that co-conspirator Dealers limiting access to the Fully Functional Tool benefits Deere in several ways:

---

[15] *See In re Deere & Co.*, 703 F. Supp. 3d at 908.

> [F]irst, Deere could inflate the prices of Repair Parts that the Dealerships could then charge the farmers. Second, Deere could serve as the only practical option for repair financing. Third, Deere could hide latent defects—and thus help avoid liability under the warranty—by tightly controlling information learned during the repair process.[16]

116. Critically, the Fully Functional Tool is frequently required to understand what an error code means and what repair it is indicating needs to be made. In newer models of Deere C&F equipment, Deere has increased the number of error codes, creating new barriers to self-repair or repair by non-Deere mechanics.

117. Even when equipment owners can interpret error codes and perform repairs themselves, they may still need a complete repair tool to authorize the repair, "pair" the new part to the machine, and eliminate the error code. Until the error code is cleared, the equipment will not operate properly even if the correct replacement part has been installed.

118. In other instances when equipment owners can interpret error codes for themselves, the Diagnoses and Tests Service Manual nonetheless instructs owners to bring their equipment to a Deere Dealer for repair services. The Operator Manuals for Deere C&F equipment offer little to no guidance on how an owner could repair their machine themselves. Nor can equipment owners access the more comprehensive materials available to Deere Dealers given the restrictions on information sharing in the dealer agreements.

119. As a result, even if a Deere C&F equipment owner could interpret the error code themselves and diagnose what repair needs to be made, and even if they could make the repair, Deere's technological restrictions nonetheless force owners to seek repairs from Deere Dealers. Those Deere Dealers have exclusive access to the Fully Functional Tool needed to clear any error codes and return the equipment to proper operability.

---

[16] *Id*. at 907-08.

120. Owners, having already made significant up-front investment by purchasing new Deere C&F equipment, must settle for whatever Deere Dealer is available, no matter how inconveniently located, under-resourced, or overpriced that Deere Dealer may be. Otherwise, without access to the Fully Functional Tool, the Deere C&F equipment will sit idle.

121. In addition to jointly restricting access to the Fully Functional Tool, Deere and the Deere Dealers collectively conspire in other ways as well. For example, each Deere C&F equipment owner is "assigned" to a Deere Dealer. Once a C&F equipment owner is assigned to a Deere Dealer, only that Deere Dealer will be willing to sell Deere C&F equipment to that owner. If a Deere C&F equipment owner seeks to purchase Deere C&F equipment through a different Deere Dealer, that "non-assigned" Deere Dealer will decline to sell and may even refuse to provide a quoted price. This practice of "assigning" Deere Dealers demonstrates the existence of an ongoing conspiracy between and among Deere Dealers. Deere Dealers are in constant communication with other authorized Deere Dealers, their horizontal competitors, regarding their mutual commitment to refrain from competing for customers.

122. Construction and forestry operations are often based in remote stretches of the United States, many miles away from Deere Dealers. Decades of consolidation and coordination among these co-conspirators have further increased the distances between Deere C&F equipment owners and access to the Fully Functional Tool. This makes it difficult for Deere C&F owners to obtain timely repairs, exacerbating the economic harm from having equipment remain idle.

123. When an error code appears that can only be cleared by a Deere Dealer technician with access to the Fully Functional Tool, owners are forced to either wait for a technician to travel to them, paying for the technician's travel time, or to pay equally high costs to transport their

34

equipment to the dealer themselves. They may also need to rent substitute equipment while waiting for repairs in order to meet contractual deadlines or keep up with their construction schedule.

### ii.      Deere Offers A Limited Version of Service ADVISOR to the Public

124.    After years of criticisms about Deere requiring even the most basic repairs to be performed by Deere Dealers with access to Service ADVISOR, Deere, in 2011, released Customer Service ADVISOR, which it billed as a "service tool…a subscription based digital database of Operator, Diagnostic, and Technical manuals for John Deere Products. It is very similar to Service ADVISOR used by our John Deere dealers and technicians with the exception of software updates, remote capabilities, and access to DTAC solutions."[17] The original version of the product was only available for purchase through a Deere Dealer and was not generally made available on Deere's website.

125.    Deere claimed Customer Service ADVISOR was "similar" to its Dealer-only software, but conspicuously failed to disclose that there were certain issues that could not be diagnosed using Customer Service ADVISOR and would continue to require access to Service ADVISOR through a Deere Dealer.

126.    The new customer repair tool was nothing more than a significantly degraded and ineffective version of the genuine Fully Functional Tool. Customer Service ADVISOR lacked essential functions necessary for repair, including reprogramming and the ability to conduct certain tests and calibrations as well as critical information that continued to be exclusively provided to Deere Dealers. Thus, early adopters of Customer Service ADVISOR learned that access to the

---

[17]     John Deere, *Enhancing Self-Repair Tools: Customer Service ADVISOR Launches in JohnDeereStore.com*, https://www.deere.com/en/our-company/repair/customer-service-advisor-launches-in-johndeerestore/.

Fully Functional Tool (a.k.a. the dealer version of Service ADVISOR and associated critical information) was needed to make many repairs, including the Restricted Deere C&F Repairs.

127. Customer Service ADVISOR therefore did not materially change the status quo and owners were still forced to use the artificially inflated prices charged by Deere Dealers for these repairs and for the replacement parts needed to effectuate such repairs. Customer Service ADVISOR thus did nothing to break the Deere Dealers' monopoly over Restricted Deere C&F Repairs.

128. In addition to its limited capabilities, Customer Service ADVISOR, as originally introduced, was prohibitively expensive for many Deere C&F equipment owners and IRPs. Accessing Customer Service ADVISOR means paying several thousands of dollars in annual subscription fees. For C&F equipment owners and IRPs, given its significant limitations, the cost of Customer Service ADVISOR far outweighed its benefits.

129. Customer Service ADVISOR was no substitute for the Fully Functional Tool, nor was it intended to be.

### iii. Deere Maintains Its Control Even With Increased Scrutiny

130. Even in the face of growing public outcry and legislative changes, Deere and the co-conspirator Deere Dealers maintained their monopoly over the aftermarket for the Restricted Deere C&F Repairs and continued to extract monopoly rents from owners. Despite this, Deere and the Deere Dealers made false promises that misled the public and Deere C&F equipment owners who purchased their equipment to believe that Customer Service ADVISOR would enable them to freely repair their own equipment or select their preferred IRP to perform all repairs on their Deere C&F equipment.

131. Deere Dealers were members of the Equipment Dealers Association ("EDA"), which merged with other associations to form NAEDA. NAEDA serves as the mouthpiece for Deere Dealers on "right to repair" issues.

132. Deere Dealers specializing in C&F Equipment, including RDO, JRE, and West Side, have served as NAEDA board members.

133. In September 2018, the EDA and the Association of Equipment Manufacturers ("AEM"), a trade association representing Deere and other manufacturers, issued a "Statement of Principles," claiming that "maintenance, diagnostic and repair information . . . will be made available to end users through authorized agricultural dealers at fair and reasonable terms, beginning with tractors and combines put into service on or after January 1, 2021."[18] The Statement of Principles went on to declare that the industry, even outside of the agriculture sector, "supports equipment users' ability to maintain, diagnose, and repair their machinery."[19]

134. Three years later, in 2021, Deere equipment owners, including Deere C&F equipment owners, found that they still could not access the Fully Functional Tool from Deere or Deere Dealers notwithstanding the EDA/AEM Statement of Principles. Journalists from VICE investigated the availability of necessary repair tools, including Service ADVISOR, by calling nine dealerships across seven states.[20] On every single phone call, dealer representatives told the journalists that the repair tools promised in the Statement of Principles had not been made available

---

[18] AEM, *Farm Equipment Manufacturers and Dealers are Committed to Providing Maintenance, Diagnostic, and Repair Tools to End Users*, R2RSolutions.org, https://web.archive.org/web/20180830201228/http://www.r2rsolutions.org/assets/pdf/r2r_statement_of_p rinciples.pdf.

[19] *Id.*

[20] Jason Koebler & Matthew Gault, *John Deere Promised Farmers It Would Make Tractors Easy to Repair. It Lied.*, Vice Motherboard (Feb 18, 2021, 2:17 PM), https://www.vice.com/en/article/john-deere-promised-farmers-it-would-make-tractors-easy-to-repair-it-lied/.

to owners.[21] One representative specifically told the journalists that the tools necessary to fulfill the promises made in the Statement of Principles were not licensed to the public and could only be licensed by a Deere Dealer.[22]

135. Even after the VICE investigation exposed the empty promise behind the "Statement of Principles," Deere and the Deere Dealers continued to pay lip service to the "right to repair." In response to VICE's reporting, AEM spokesperson Michael O'Brien explained that right to repair legislation was unnecessary because Deere and other manufacturers were supposedly making tools widely available. He wrote, "It keeps coming back to this: If a farmer wants to repair the equipment, and we're making available the tools to do so in a good-faith effort to address their code needs, then why do we need to pass these Right to Repair laws covering farm equipment?"[23]

136. With the increased public attention and scrutiny on the agriculture segment, on January 8, 2023, Deere signed a Memorandum of Understanding with the American Farm Bureau Federation, promising to form a "voluntary private sector commitment to outcomes rather than legislative or regulatory measures" to address equipment owners' concerns.[24] Like the 2018 EDA/AEM Policy Statement, this Memorandum of Understanding allegedly would "continue to enhance the ability of Farmers to timely control the lawful operation and upkeep of Agricultural Equipment," and to ensure the timely availability of certain repair tools and software.[25] In exchange for this commitment from Deere, the American Farm Bureau Federation promised not to introduce or support any state right to repair legislation.

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] American Farm Bureau Federation, *Memorandum of Understanding*, https://www.fb.org/files/AFBF_John_Deere_MOU.pdf.

[25] *Id.*

137. The Memorandum of Understanding contained limited enforcement mechanisms, and Deere's obligation to uphold its end of the bargain was mostly voluntary. Unsurprisingly given its pattern of failing to honor its commitments, Deere failed to live up to its "obligations" to the agriculture equipment owners, even under increased public scrutiny and the express promises in the Memorandum of Understanding.

138. U.S. Public Interest Research Group ("PIRG"), a leading supporter of right to repair, compared the effect of Deere's Memorandum of Understanding on equipment owners to Charlie Brown: "farmers have lined up for the kick too many times to let Lucy pull the ball away again."[26] The National Farmers Union similarly cautioned members that the Memorandum of Understanding between Deere and American Farm Bureau Federation is "riddled with potential loopholes."[27]

139. And despite Deere's promise in the Memorandum of Understanding to "assure the timely availability, on Fair and Reasonable terms, of Tools, Specialty Tools, Software and Documentation," Deere never made a complete version of Service ADVISOR available to agriculture equipment owners or IRPs. Similarly, Deere never made a complete version of Service ADVISOR available to Deere C&F equipment owners or IRPs either.

140. Just as Deere misled agriculture equipment owners, it also misled C&F equipment owners with empty and unfulfilled promises. After years of waiting for Deere and the Deere Dealers to provide meaningful access to the Fully Functional Tool, Deere C&F equipment owners were still forced to use Deere Dealers to make Restricted Deere C&F Repairs.

---

[26] Public Interest Research Group, *Statement: Farm Bureau signs Right to Repair deal with John Deere* (Jan. 8, 2023), https://pirg.org/media-center/statement-farm-bureau-signs-right-to-repair-deal-with-john-deere/.

[27] National Farmers Union, *Recent John Deere – Farm Bureau Deal*, https://nfu.org/wp-content/uploads/2023/01/FFF_R2R_01132023-1.pdf.

### iv. Deere and the Deere Dealers Fight Right to Repair

141. Over the last decade, the right to repair movement has grown. Many groups and citizens advocate for legislation and regulations to ensure that people who own equipment, like Deere C&F equipment, are able to repair the products they own free of restrictions like those imposed by Deere.

142. Because advocates' efforts threaten to remove the anticompetitive technical and structural barriers erected by manufacturers like Deere, it is unsurprising that, at every turn, Deere and the Deere Dealers have resisted change. In fact, Deere's 2025 10-K filing lists "right to repair regulations and legislation" as an "Item[] of Concern and Uncertainty."[28]

143. In a boon for the right to repair movement, the FTC issued a May 2021 report examining potentially anticompetitive practices in repair markets in response to a request from Congress.[29] In drafting that report, the FTC conducted a July 16, 2019 workshop on repair restrictions, received public comments, conducted independent research, and requested and received empirical research and data from interested parties.[30]

144. The FTC's report recognized how repair restrictions may increase costs to consumers and limit consumers' choice in maintaining the equipment they own.[31] After analyzing the voluminous evidence, the FTC concluded that repair restrictions have "steered consumers into manufacturers' repair networks" to consumers' detriment. As for the manufacturers' arguments in

---

[28] Deere 2025 10-K at 34.

[29] Fed. Trade Comm'n, *Nixing the Fix: An FTC Report to Congress on Repair Restrictions* (May 2021), at 3, https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf (hereinafter, the "FTC Report").

[30] *Id.*

[31] *Id.*

favor of repair restrictions, the FTC found only "scant evidence to support manufacturers' justifications."[32]

145. Manufacturers, like Deere, often claim that repair restrictions, such as limiting repairs to authorized dealers, are necessary for safety, safeguarding intellectual property, or legal compliance. In its report, the FTC outright dismissed any invocation of intellectual property ("IP") rights, noting these rights "do not appear to present an insurmountable obstacle to repair" since customers can often make repairs while complying with copyright or trade secret law.[33] The FTC also dismissed manufacturers' concerns about safety and cybersecurity, finding manufacturers' evidence for these arguments was "anecdotal" and insufficient to establish "that repairs conducted by independent repair shops would be inferior to those conducted by authorized repair shops if independent repair shops were provided with greater access to service manuals, diagnostic software and tools, and replacement parts as appropriate."[34]

146. Finally, the FTC specifically called out the Deere and Deere Dealers' trade associations, AEM and EDA, respectively, for their claim that a mere "Statement of Principles" provided a proper framework for "self-regulation that could apply in the broader right to repair context."[35] The FTC noted that, while "self-regulation can help address concerns about repair restrictions in discrete markets . . . no industry sector other than the automotive industry has worked to open repair markets through a self-regulatory framework."[36]

147. Neither Deere nor Deere Dealers have abided by the key takeaways from the FTC's report. Instead of opening up the Deere C&F equipment aftermarkets to competition from IRPs

---

[32] *Id.* at 6.
[33] *Id.* at 26.
[34] *Id.* at 38.
[35] *Id.* at 46 and n.253.
[36] *Id.* at 46.

and equipment owners, Deere and its Deere Dealer co-conspirators continue to oppose increasing access to crucial repair tools at every turn to maintain their exclusive control over Restricted Deere C&F Repairs.

148. Deere and its trade group AEM routinely make misleading statements about what repair tools are accessible to customers. Deere's objectives are clear: stave off legislative efforts that would actually require it and its Dealers to make complete repair tools available to owners or IRPs. To this end, Deere representatives insisted that agriculture customers should not believe their own eyes and experience. In a meeting with the Florida Farm Bureau in 2021, Deere customer support manager Aaron Vancil insisted that Deere "provide[s] diagnostic tools, repair manuals, parts . . . you've always had parts, you've always been able to get manuals."[37] Despite all evidence to the contrary, he told the assembled customers, "you have the right to repair your own equipment."[38]

149. Deere has also published numerous stories on its website advancing the misleading narrative that customers have control over repairing their machines. For example, one article claims that customers do not need to use a Deere Dealer to repair equipment: "Customers can use their John Deere dealer, an alternative service provider, or do the work themselves. We empower customers to choose how their equipment is maintained, diagnosed, and repaired."[39] Other articles on Deere's website claim, "If you own a John Deere machine… you can fix it yourself."[40]

150. In addition, NAEDA provides the Deere Dealer members with "Right to Repair Opposition Talking Points." The first talking point states, "I do not think Right to Repair legislation

---

[37] Koebler & Gault, *supra* note 20.
[38] *Id.*
[39] John Deere, *Repair Your Equipment. Your Way. Get the Facts.*, https://www.deere.com/en/stories/featured/repair-fact-vs-fiction/.
[40] John Deere, *You Can Fix Your Deere: Here's the Truth About Repairs*, Aug. 27, 2025, https://www.deere.com/en/stories/featured/pro-service-myth/.

is necessary for our industry. Currently, most everything a customer would need to diagnose or repair their equipment is already available. This includes operators and technical manuals, diagnostic routines, tools, parts, schematics as well as electronic service capabilities."[41] In reality, NAEDA members know "most everything a customer would need to diagnose or repair" is not available to Deere C&F equipment owners or IRPs. Indeed, those same NAEDA members are the ones ensuring access to the Fully Functional Tool remains exclusively within the Deere Dealer network.

151. NAEDA is also on the front lines opposing nearly every piece of right to repair legislation. As recently as 2025, NAEDA opposed Virginia House Bill 2483, the "Digital Right to Repair Act," which was designed to require OEMs, like Deere, to provide "digital electronic equipment, or parts for such equipment…to owners of such equipment and to independent repair providers, on fair and reasonable terms," along with "documentation, parts, and tools for purposes of diagnosis, maintenance, or repair of such equipment."[42] In its opposition, NAEDA touted its size, noting that it represents "approximately 4,500 farm, industrial, and outdoor power equipment dealers in North America."[43] NAEDA claimed that "[m]andating that OEMs sell parts and tools on the same terms and conditions as they sell to authorized dealers would have dramatic negative consequences."[44]

152. Despite Deere's and Deere Dealers' best efforts, right to repair legislation has been successful in some states, including Colorado. Colorado's 2023 right to repair law requires agriculture equipment manufacturers to make embedded software and repair tools available to

---

[41] NAEDA, *Right to Repair Opposition Talking Points*, https://www.naeda.com/wp-content/uploads/2023/06/NAEDA-R2R-Talking-Points-Sept-MP.pdf.

[42] HB 2483 Digital Right to Repair Act, https://lis.virginia.gov/bill-details/20251/HB2483.

[43] NAEDA, *In OPPOSITION to H.B. 2483*, https://www.naeda.com/wp-content/uploads/2025/01/VA_HB_2483_Position_Statement_by_NAEDA.pdf.

[44] *Id.*

equipment owners and independent repair businesses, among other obligations. *See* Colo. Rev. Stat. § 6-1-1503(1). However, similar bills that would have ensured consumers access to repair tools have not been passed, despite increasing public support. And, thanks in large part to the efforts of Deere and the Deere Dealers, no legislation has been passed to directly address the right to repair Deere C&F equipment.

### v. Deere Again Alters Customer Service ADVISOR In an Effort to Appease the Public and Deere C&F Equipment Owners

153. Until 2022, Customer Service ADVISOR for Deere C&F equipment was only available through Deere Dealers, who had little incentive to promote that product. When customers called Deere Dealers to inquire about purchasing the software, many Dealers denied its existence or insisted that it could not be sold to equipment owners.[45]

154. But, as public scrutiny continued to build around the right to repair movement, Deere was forced to begin advertising and selling Customer Service ADVISOR directly to the public.

155. Beginning in the summer of 2022, Deere made an updated version of Customer Service ADVISOR available for direct purchase from its website. As it does with all parts of its business, Deere offered a specific Customer Service ADVISOR product for Deere C&F equipment owners, segregating it from complementary products for the "Ag" and "Turf" market segments. As a result, Deere customers who own both agriculture and C&F equipment cannot use the agriculture version of Customer Service ADVISOR on Deere C&F equipment, or vice versa. The fact that Deere sold distinct ADVISOR products for agriculture versus C&F equipment reinforces that Deere C&F equipment is repaired in a separate and unique aftermarket compared to other segments of Deere's business.

---

[45] *See* Koebler & Gault, *supra* note 20.

156. Deere offered two versions of the software license for Customer Service ADVISOR for Deere C&F equipment owners. For $2,700, a customer could purchase a one-year license of the Customer Service ADVISOR web application, which provides nothing more than a digital database of operator and technical manuals. The web application license does not allow a customer to connect to equipment, diagnose issues, or clear error codes.

157. For $3,160, a customer could also purchase a one-year license for a Customer Service ADVISOR product that had the ability to connect to Deere equipment. This version allowed a customer to perform vaguely described "diagnostics and readings." However, even the more expensive license had only a limited ability to perform calibrations and did not include access to CCMS/DTAC. Additionally, to actually connect the Customer Service ADVISOR software to C&F equipment, owners needed to purchase a Machine Interface Kit for an additional $1,376.93.

158. Like the version available for purchase only from a Deere Dealer starting in 2011, this new version of Customer Service ADVISOR lacked many of the essential features needed to repair Deere C&F equipment. It could not reprogram, perform calibrations and tests, nor access the solutions repository and the help desk features of CCMS/DTAC, all of which are critical to troubleshooting and diagnosing common issues. Given the degraded functionality of Customer Service ADVISOR, even after paying thousands of dollars per year for access, owners still were forced to use Deere Dealers for the Restricted Deere C&F Repairs, including all computer-based repairs and repairs that required the Fully Functional Tool to pair replacement parts with Deere C&F equipment.

159. Deere C&F equipment owners purchased Deere C&F equipment with an expectation, based largely on Deere's own statements, that they or an IRP could utilize Customer Service ADVISOR to complete any and all repairs to Deere C&F equipment. But Deere's promises

45

were illusory—the 2022 version of Customer Service ADVISOR was little better than its predecessor. Deere's bait-and-switch strategy continued to lock in owners who had no choice but to use Deere Dealers to perform the Restricted Deere C&F Repairs at inflated prices for both Restricted Deere C&F Repairs and the associated Deere C&F Parts necessary to effectuate those repairs.

### E. In the Face of Antitrust Litigation, Deere Continues to Move the Goal Posts

160. In October 2022, a consolidated complaint was filed in the Ag Class Case, alleging that Deere and its co-conspirator dealers had monopolized "the repair service market" for Deere branded agriculture equipment.

161. In November 2023, Judge Johnston denied Deere's motion for judgment on the pleadings in the Ag Class Case, holding, in part, that the plaintiffs sufficiently alleged antitrust standing, that authorized Deere dealerships did not need to be joined as defendants to the litigation, that there were sufficient allegations supporting a hub-and-spoke conspiracy between Deere and the authorized dealers, and that the plaintiffs properly alleged a Deere-specific agriculture equipment aftermarket.[46]

162. On January 15, 2025, the FTC, along with the Attorneys General of Illinois and Minnesota,[47] sued Deere over just its agriculture equipment repair restrictions, alleging that

---

[46] *See In re Deere & Co.*, 703 F. Supp. 3d at 913. Then, on April 6, 2026, a settlement agreement in the Ag Class Case was announced between the class of agriculture equipment owners and Deere. As part of that settlement, Deere agreed to pay $99 million into a settlement fund for distribution to the class and further agreed to provide to class members "the digital tools required for the maintenance, diagnosis and repair" of Deere's agriculture equipment for 10 years. Memorandum of Law In Support of Plaintiffs' Motion for Preliminary Approval of Settlement at 5-6, *In re Deere & Co.*, MDL No. 3030 (N.D. Ill. Apr. 6, 2026), ECF No. 333-1.
[47] After the filing of the initial complaint, Arizona, Michigan, and Wisconsin joined the lawsuit.

Deere's unfair practices "have driven up equipment repair costs for farmers while also depriving farmers of the ability to make timely repairs on critical farming equipment, including tractors."[48]

163.    In its press release announcing the FTC Case, the FTC claimed, "for decades, Deere's unlawful practices have limited the ability of farmers and independent repair providers to repair Deere equipment, forcing farmers to instead rely on Deere's network of authorized dealers for necessary repairs. This unfair steering practice has boosted Deere's multi-billion-dollar profits on agricultural equipment and parts, growing its repair parts business while burdening farmers with higher repair costs."[49] Deere's motion to dismiss the FTC Case was denied on June 9, 2025.[50]

164.    Faced with two antitrust lawsuits, Deere once again altered its stance and introduced yet another incomplete repair tool. On July 31, 2025, Deere phased out the Service ADVISOR systems and introduced "John Deere Operations Center PRO Service." The publication Ag Web reported, "[i]n what appears to be a direct response to anti-competition claims raised in the ongoing [FTC] v. John Deere Right to Repair lawsuit, [Deere] has released an updated digital service tool to enable equipment owners to maintain, diagnose, repair and protect farm equipment."[51]

165.    In its press release, Deere stated that the launch of John Deere Operations Center PRO Service "reaffirms John Deere's support of customer self-repair."[52] Deere added, "[w]e view

---

[48]    Federal Trade Commission, *FTC, States Sue Deere & Company to Protect Farmers from Unfair Corporate Tactics, High Repair Costs* (Jan. 15, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-states-sue-deere-company-protect-farmers-unfair-corporate-tactics-high-repair-costs.
[49]    *Id.*
[50]    *Fed. Trade Comm'n v. Deere & Co.*, No. 25-cv-50017, 2025 WL 1638474 (N.D. Ill. June 9, 2025).
[51]    Matthew J. Grassi, *Right to Repair Granted? John Deere Launches Digital Self-Repair Tool for $195 Per Tractor*, Farm Journal AgWeb (July 31, 2025, 10:20 AM), https://www.agweb.com/news/machinery/right-repair-granted-john-deere-launches-digital-self-repair-tool-195-tractor.
[52]    John Deere, *John Deere Launches Enhanced Digital Self-Repair Tool* (July 31, 2025), https://www.deere.com/en/news/all-news/enhanced-digital-self-repair-tool/.

47

continuously enhancing self-repair as consistent with our mission to ensure John Deere customers have the best machine ownership experience possible."[53]

166.  Like Customer Service ADVISOR, John Deere Operations Center PRO Service offers distinct software for different market segments. Deere offers a $5,995 version called "John Deere Operations Center PRO Service For Construction and Forestry Services Business," which works specifically with C&F equipment.[54] The "Agriculture and Turf Service Business" software, designed specifically to work with Agriculture and Turf equipment, also costs $5,995 for a one-year license.[55]

167.  And just like Customer Service ADVISOR, Deere Operations Center PRO Service does nothing to evince Deere's purported "support of customer self-repair." To the contrary, Operations Center PRO Service does not provide Deere C&F equipment owners or IRPs with a Fully Functional Tool that allows owners to complete the Restricted Deere C&F Repairs without involving a Deere Dealer. Deere's promotional materials for Operations Center PRO Service tout its reprogramming capabilities, but then qualify those claims with an asterisk and a footnote that explains that "[c]ertain engine related tests and calibrations are not currently available. Reprogramming functionality may not be available for non-John Deere controllers."[56] Deere thus acknowledges that it is still offering owners a tool that is not an equivalent to the Fully Functional Tool that Deere continues to license to Deere Dealers.

---

[53]  *Id.*
[54]  John Deere, *Operations Center PRO Service - Service Business - Construction & Forestry (Annual License)*, https://shop.deere.com/us/product/Operations-Center-PRO-Service---Service-Business---Construction-%26-Forestry--Annual-License-/p/PROSERVICECF.
[55]  John Deere, *Operations Center PRO Service - Service Business - Agricultural and Turf (Annual License)*, https://shop.deere.com/us/product/Operations-Center-PRO-Service---Service-Business---Agricultural-and-Turf--Annual-License-/p/PROSERVICEAG.
[56]  John Deere, *Operations Center PRO Service*, https://www.deere.com/en/technology-products/operations-center-pro-service/.

168. For example, remote software updates and reprogramming are only available for select controllers, and remote diagnostics only on "machines with 4G MTG." Among the equipment with non-John Deere controllers that cannot be reprogrammed are several models of dozers and compact wheel loaders.[57] Consequently, Deere C&F equipment owners are still forced to rely on Deere Dealers to perform the Restricted Deere C&F Repairs at inflated prices for the Restricted Deere C&F Repair Services they provide and for the associated Deere C&F Parts needed to effectuate such repairs. Owners must pay those inflated prices, regardless of the expense, quality of repairs, or turnaround times.

169. There is no hardware issue or other technological bar preventing Deere from living up to its promises. Deere is fully capable, as it always has been, of providing either the Fully Functional Tool or an equivalently fully functional tool to owners and IRPs.

170. Accordingly, John Deere Operations Center PRO Service has proven to be yet another example of Deere's bait-and-switch strategy. Owners who purchased a license to John Deere Operations Center PRO Service, including Christy Webber, have found that this tool still does not provide the full functionality promised by Deere. Without full functionality, C&F equipment owners are forced to rely on the Deere Dealers for access to the complete diagnostics of the Fully Functional Tool. Thus, to date, Deere C&F equipment owners remain locked into utilizing Deere Dealers for all Restricted Deere C&F Repairs and the purchase of Deere C&F Parts to effectuate such repairs.

171. Deere, throughout its history, which includes the Class Period, has never disclosed at the point of a Deere C&F equipment purchase which repairs require access to the Fully Functional Tool, how frequently such repairs can be expected to occur over the useful life of each

---

[57] *Id.*

machine, which DTCs require CCMS/DTAC or payload files, which calibrations cannot be performed through Customer Service ADVISOR or Operations Center PRO Service, the expected dealer labor or travel charges for restricted repairs, or whether a given replacement part can be paired without dealer-level access.

**F.    Additional Deere Repair Restrictions Have Been Overruled by the EPA**

172.    The Environmental Protection Agency ("EPA") has also recognized the harmful effect that repair restrictions have on customers.

173.    In addition to restricting access to a complete repair tool, Deere has weaponized language in the CAA to further restrict access to necessary repairs. Specifically, Deere has claimed that it could be liable to the EPA under CAA regulations for farm and other nonroad diesel equipment for allowing "tampering" of its equipment's emissions control systems. In 2021, a Deere representative explained that customer access to software systems "starts getting into some areas…where you start having federal topics being introduced from an emissions standpoint."[58]

174.    That claim was false. In fact, on February 12, 2024, Deere sent a notice to its equipment owners entitled "IMPORTANT EMISSIONS WARRANTY INFORMATION." In this notice, Deere admitted that it had omitted from the Operator's Manual a statement "which clarifies aftermarket support requirements to maintain emissions compliance."[59] That replacement statement was updated to read: "[a] repair shop or person of the owner's choosing may maintain, replace, or repair emission control devices and systems with original or equivalent replacement parts."[60]

---

[58]  Koebler & Gault, *supra* note 20.
[59]  Letter from Chris Davison, Deere & Company, to John Deere Customer (Feb. 12, 2024), https://drive.google.com/file/d/1gop5T0gfHMFQs1eIwSOAGcPSUfqcLp7l/view?pli=1.
[60]  *Id.*

175. Despite completely reversing course in its emissions clarification notice, Deere has continued to muddy the waters regarding whether the CAA prevents certain types of repairs. On June 3, 2025, Deere sent a letter to the EPA arguing that it needed EPA approval to license "enhanced equipment service solutions" to "authorized Deere dealers, end-customers, and independent repair technicians."[61] In that letter, Deere claimed it remained confused over the impact of EPA regulations and admitted that it "does not make available to the general public a tool or engine controller that allows the full reset of a final inducement condition in order to abide by EPA's requirements."[62]

176. The issue of whether or not the CAA restricts self-repair was resolved on February 2, 2026. In a press release, the EPA specifically points to Deere's letter as an example of how, "[f]or far too long, manufacturers have wrongly used the Clean Air Act to monopolize the repair markets."[63]

177. The press release further states the following:

> EPA's guidance does not change the law, weaken emission standards, or reduce compliance obligations. Rather, it clarifies what the CAA already states, that temporary overrides of emission control systems are allowed when it is for the 'purpose of repair' to that equipment to obtain proper functionality. This clarification applies to all nonroad diesel engines equipped with advanced emission control technologies including selective catalytic reduction and inducement systems as well as Diesel Exhaust Fluid (DEF) system repairs. *Importantly, farmers and equipment owners are not required to rely on authorized dealers exclusively to fix equipment*. This makes clear that the law should not serve as a barrier to timely, affordable maintenance of agricultural equipment.[64]

---

[61] Letter from Justin G. Greuel, John Deere Power Systems, to Byron Bunker, United States Environmental Protection Agency (June 3, 2025), https://assets.farmjournal.com/46/a9/a35ae1fc4f4599cc126250689f23/deere-request-for-review-epa-3-june-2025.pdf.

[62] *Id.*

[63] *EPA Advances Farmers' Right to Repair Their Own Equipment, Saving Repair Costs and Productivity*, February 2, 2026, https://www.epa.gov/newsreleases/epa-advances-farmers-right-repair-their-own-equipment-saving-repair-costs-and.

[64] *Id.* (emphasis added).

51

178.     The "nonroad diesel engines" referenced in the EPA's guidance include Deere C&F equipment.

179.     Shortly thereafter, Deere acknowledged the EPA's definitive rejection of its argument that the CAA justifies repair restrictions. Denver Caldwell, Vice President, Aftermarket & Customer Support, stated in a press release that the "EPA has made clear [Deere] can now offer repair tools that allow our customers to temporarily override inducements to get a machine running again and return it to full emissions compliance."[65] But as Deere well knew based on its emissions clarification notice, that was already the case. Deere never had any obligation to restrict access to the Fully Functional Tool under the CAA, and its purported reliance on emissions regulations was, at best, misplaced and at worst, pretextual.

## VII.     DEERE'S ANTICOMPETITIVE CONDUCT BENEFITS DEERE AND THE DEERE DEALERS WHILE HARMING COMPETITION AND INJURING THE CLASS

180.     As detailed above, Deere's conduct, including its public misstatements and withholding of a Fully Functional Tool, only benefits Deere and the Deere Dealers.

181.     In engaging in anticompetitive acts that limit the availability of a Fully Functional Tool to the Deere Dealers, Deere harms Deere C&F equipment owners. Deere Dealers remain the sole entities that can perform complete diagnostics and, thus, are the only providers for Restricted Deere C&F Repairs. The restrictions have therefore had the effect of raising prices and lowering the quality and quantity of repairs and replacement parts due to delays.

182.     Recognizing the high profit margins to be made in the monopolized markets, Deere has, in recent years, focused corporate efforts on repairs as well as replacement parts as a way to

---

[65]     John Deere, *Why EPA Guidance Matters for Farmers and Equipment Owners*, https://www.deere.com/en/stories/featured/epa-guidance/.

boost overall firm profits.[66] Its efforts have been rewarded—pushing its already-high margins on repair services and replacement parts even higher.

183.    As seen below, Deere's anticompetitive conduct has allowed it to sustain high gross profit margins over the last decade.



**Deere's Overall Gross Profit Margins, 2016-2025**

Source: John Deere 10-K filings, 2016-2025; John Deere Historical Fact Book.

184.    And in the C&F segment of its business, Deere has likewise sustained high operating profit margins. These high profit margins exist even as Deere introduced various iterations of its non-fully functional repair tool to the general public. At best, those non-fully

---

[66]  Rajesh Kumar Singh, *Deere bets on cost cuts, services push to boost profits*, Reuters (Jan. 8, 2020), https://www.reuters.com/article/us-deere-strategy/deere-bets-on-cost-cuts-services-pushto-boost-profits-idUSKBN1Z72TA.

functional repair tools offer limited relief, i.e., the ability to perform some additional repairs that were previously unavailable to equipment owners.



**Operating Profit Margins for Deere's C&F Segment, 2016-2025**

Source: John Deere 10-K filings, 2016-2025; John Deere Historical Fact Book.

185.    Since its anticompetitive scheme has proven immensely profitable, Deere continues to conjure justifications for repair restrictions, even as each past explanation is debunked.

186.    And because Deere C&F equipment owners still cannot access the Fully Functional Tool (or its equivalent) on their own or through IRPs, they have been forced to pay inflated prices for both Restricted Deere C&F Repairs and Deere C&F Parts to the Deere Dealers.

187.    Any repairs that require reprogramming of any ECU, some test and calibration repairs, and any repair that would require access to solutions collected in Deere's CCMS repository or use of the CCMS help desk require a Fully Functional Tool. The Restricted Deere C&F Repairs comprise a significant amount of total repairs of Deere C&F equipment, whether measured by value or by volume.

54

188.    Deere's locking in of customers to the repair services offered by Deere Dealers and the replacement parts sold by Deere is further compounded by the fact that Deere C&F equipment owners prefer to perform all repairs in a single visit to minimize downtime. Thus, if any restricted repair is (or may be) required for a piece of equipment, the Fully Functional Tool gives Deere Dealers (and Deere) an incremental competitive advantage for all repair services and replacement parts, including those that do not implicate ECUs.

189.    In addition to being disadvantaged in competing to perform repair services on Deere C&F equipment, Deere C&F equipment owners also incur additional service costs. For example, instead of being free to choose to rely on their own capabilities or those of an IRP to complete repairs in the most economical and expeditious manner, equipment owners must pay Deere Dealers' substantially higher hourly labor rates and often are unable to obtain timely dealer service. These untimely repairs cause significant economic damage to owners who must rent replacement equipment (typically from the very Deere Dealers who are failing to timely make those repairs) while expensive Deere C&F equipment sits idle waiting to be fixed.

190.    Deere and the Deere Dealers further benefit from spillover effects from these restricted repairs because it is often not clear whether a given equipment issue will require hiring a Deere Dealer technician. When equipment owners are faced with an error code on their machine, it is often unclear whether the repair will require a Fully Functional Tool to correctly troubleshoot the issue or whether the repair can in fact be completed by an IRP or by the owner. Because of the risk that owners will haul their machines, at great expense, to an IRP only to be informed that the repair requires the technical services of an authorized Deere Dealer, many equipment owners will not even bother seeking out service from IRPs. Construction and forestry operations cannot afford to waste time and money working with two different repair shops. As a result, owners are likely to

bring their Deere C&F equipment to Deere Dealers even for repairs that ultimately turn out not to require access to the Fully Functional Tool.

191.    The uncertainty created by Deere's anticompetitive conduct steers a greater number of repairs toward Deere Dealers than there would be in the absence of Deere's repair restrictions. Deere Dealers benefit by making more repairs than they would if owners had access to the Fully Functional Tool, and Deere benefits by selling more parts through its authorized Dealers at prices unaffected by competition from third-party aftermarket parts manufacturers.

192.    Sales of parts are especially lucrative for both Deere and Deere Dealers, often commanding gross margins in excess of 30%, as compared to 7% or less on new equipment sales.[67] Deere's agreements with dealerships require Deere Dealers to "actively and aggressively promote the sale of Parts and Service."[68] Deere also earns revenue through subscriptions for its Fully Functional Tool and by financing customers' parts and service purchases from dealers. It has a further economic interest in controlling warranty service and in data from service repairs. By controlling information learned during the repair process, Deere could hide latent defects and help decrease its liability under warranty. Deere thus has an interest in both selling more parts and in funneling more service repairs to its authorized dealers.

193.    Defendant's anticompetitive conduct has caused Plaintiff Christy Webber and members of the Class to suffer significant antitrust injury in the form of artificially inflated prices for Restricted Deere C&F Repairs and the associated Deere C&F Parts needed to effectuate those repairs. Members of the Class have also been deprived of free and open competition for Restricted

---

[67] Ben Thorpe, *Dealers Report Strong Revenue, Gross Margins & Profits*, Farm Equipment (Jan. 24, 2022), https://www.farm-equipment.com/articles/20049-dealers-report-strong-revenue-gross-margins-and-profits.
[68]    Complaint at 21, *Fed. Trade Comm'n v. Deere & Co.*, No. 25-cv-50017 (N.D. Ill. filed Jan. 15, 2025), ECF No. 1.

Deere C&F Repairs, limiting their choices by restricting the ability of Plaintiff to self-repair or seek repair at independent repair shops even for repairs that are not restricted.

194. In a competitive market, Christy Webber and other members of the Class would have used in-house mechanics or IRPs for restricted repairs, would have avoided dealer travel and diagnostic charges, would have paid lower hourly labor rates, and would have purchased lower-cost non-Deere parts.

195. The overcharge paid by Plaintiff and members of the Class can be measured by comparing Deere Dealer labor, travel, diagnostic, and parts charges to prices charged by IRPs, in-house repair costs, or other competitive benchmarks.

196. Deere's and the Deere Dealers' purpose in engaging in this anticompetitive scheme was to exclude competition and thereby raise prices. Plaintiff and members of the Class paid supracompetitive prices during the Class Period as a direct and foreseeable result of this conduct.

## VIII. ANY PROCOMPETITIVE OR BUSINESS JUSTIFICATION DOES NOT LEGITIMIZE DEERE'S CONDUCT

197. To the extent relevant to the antitrust claims asserted herein, Deere's practices are not reasonably necessary to achieve any cognizable procompetitive or legitimate business justification. Deere could protect IP, safety, cybersecurity, and emissions compliance through licensing, authentication, audit logs, user certification, tool function tiering, emissions-specific safeguards, anti-tampering locks, and contractual remedies. Deere already provides the same sensitive tools to its authorized dealers and technicians, demonstrating that controlled access is feasible.

198. Notably, the FTC and the EPA carefully considered, and ultimately rejected, Deere's arguments that repair restrictions are necessary to protect its IP and to ensure the safety and security of its machines.

57

199.    Both federal agencies found that Deere offered little to no evidence to support its arguments against opening up the market for repair services. Given the importance of aftermarket domination to Deere's continued profitability, if such evidence existed, Deere would no doubt have brought it to the agencies' attention.

200.    To the extent Deere seeks to ground its conduct in protecting its IP rights, the FTC has clearly stated that "misuses of intellectual property rights may create barriers to independent repairs, and thereby harm competition."[69] Deere cannot hide behind the IP laws to justify its anticompetitive conduct.

## IX.    CLASS ACTION ALLEGATIONS

201.    Plaintiff Christy Webber brings this action on behalf of itself and as a representative of a class under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), seeking damages and equitable and injunctive relief on behalf of the following class:

> All persons and entities in the United States who, during the Class Period, purchased Restricted Deere C&F Repairs from a Deere-authorized C&F dealer or technician, or purchased Deere C&F Parts from Deere or a Deere-authorized C&F dealer in connection with Restricted Deere C&F Repairs.

202.    Excluded from the Class are: (1) the Defendant, and its officers, directors, and employees; any entity in which the Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of the Defendant; (2) any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any business majority-owned by any such person; (3) any Co-Conspirator identified in this Action; and (4) any federal governmental entities.

---

[69]  FTC Report, *supra* note 29, at 10.

203.     **Numerosity**. The Class is so numerous that joinder would be impracticable. There are likely thousands of buyers of Restricted Deere C&F Repairs and Deere C&F Parts across the United States.

204.     **Commonality.** There are questions of law and fact common to the Class, including but not limited to:

a.     Whether Defendant violated the antitrust laws;

b.     Whether Defendant engaged in anticompetitive conduct;

c.     Whether Plaintiff and members of the Class were harmed by Defendant's conduct;

d.     Whether Plaintiff and members of the Class are entitled to injunctive and declaratory relief to end Defendant's conduct;

e.     Whether Plaintiff and members of the Class are entitled to damages, and if so, what the appropriate measure of class-wide damages is.

205.     **Typicality.** Plaintiff's claims are typical of those of other members of the class because Plaintiff purchased Restricted Deere C&F Repairs and Deere C&F Parts and was harmed by the conduct alleged herein. Plaintiff's claims and those of other members of the Class arise from the same operative facts related to Deere's course of conduct and are based on the same legal theories. Plaintiff is advancing the same claims and legal theories on behalf of itself as other members of the Class, and thus Plaintiff's interests are typical of, and not antagonistic to, those of other members of the Class.

206.     **Adequacy of representation.** Plaintiff will fairly and adequately represent and protect the interests of the Class in that it has no disqualifying conflicts of interest that would make it antagonistic to other members of the Class. Plaintiff has retained counsel experienced in antitrust class action litigation and intends to vigorously prosecute this action.

207. **Predominance.** The common questions of law and fact identified above in paragraphs 204(a-e) predominate over any questions affecting only individual Class members.

208. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Pursuing numerous individual lawsuits would not be economically feasible for individual members of the Class, given the relatively small damages suffered by class members compared with the expense and burden of prosecuting a complex antitrust lawsuit. Given the likely large number of class members, joinder would be impracticable. A class action will preserve judicial resources by allowing the common issues of the Class to be adjudicated in a single forum, avoiding the need for duplicative discovery and hearings in individual actions based on the same facts. In addition, the benefits of proceeding through the class mechanism substantially outweigh any difficulties that may arise in management of this class action. Moreover, prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

## VIOLATIONS ALLEGED

### FIRST CAUSE OF ACTION
**Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**(Restricted Deere C&F Repairs Market)**

209. Plaintiff realleges and incorporates by reference the allegations in all of the paragraphs above.

210. Deere effectively participates in and has willfully maintained monopoly power in the aftermarket for Restricted Deere C&F Repairs through a coordinated and multifaceted exclusionary scheme, not through superior product design, business acumen, or historical accident.

211.    Deere's exclusionary conduct includes, among other things, designing Deere C&F equipment so that the diagnosis and completion of Restricted Deere C&F Repairs require the Fully Functional Tool (i.e., the Deere-controlled software, credentials, payload files, calibrations, DTC-clearing functions, part-pairing functions, CCMS/DTAC solutions, and other exclusive dealer-level resources); licensing the Fully Functional Tool exclusively to Deere Dealers; using technological controls, authentication credentials, encryption, and dealer-specific access restrictions to prevent owners and IRPs from obtaining equivalent functionality; imposing materially uniform dealer agreements that prohibit Deere Dealers from sublicensing, sharing, or otherwise providing the Fully Functional Tool or related Deere-controlled repair resources to owners or IRPs; coordinating with Deere Dealers to ensure those restrictions are uniformly followed throughout the authorized dealer network; offering owners and IRPs degraded customer-facing tools while misleadingly representing that owners can maintain, diagnose, and repair their own Deere equipment; and using the resulting lock-in to steer owners to Deere Dealers for Restricted Deere C&F Repairs and associated Deere C&F Parts.

212.    Deere possesses monopoly power in the provision of Restricted Deere C&F Repairs, as it has the power to control prices and/or to exclude competition from the market by choosing to license or otherwise provide access to the Fully Functional Tool exclusively to authorized Deere Dealers.

213.    Deere's anticompetitive conduct unreasonably restrains competition. Deere unlawfully maintains its monopoly through willful and intentional anticompetitive conduct, not through a superior product, business acumen, or historical accident, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

61

214. In denying Deere's motion to dismiss in the Ag Class Case, Judge Johnston noted that the plaintiffs there "easily" met their burden to allege that Deere excluded competition in that repair services market for Deere agriculture equipment by restricting access to necessary repair tools from owners and IRPs.[70] Plaintiff here alleges that Deere has engaged in parallel anticompetitive conduct for Restricted Deere C&F Repairs in the Deere Construction and Forestry segment.

215. Deere cannot justify this exclusionary scheme by invoking safety, emissions compliance, cybersecurity, intellectual property, trade secrets, warranty integrity, equipment integrity, or any other asserted business justification. To the extent any of those interests are cognizable, Deere's restrictions are substantially broader than necessary to serve them. Deere could protect legitimate safety, emissions, cybersecurity, intellectual property, warranty, and equipment integrity interests through less restrictive alternatives, including commercially reasonable licenses to the Fully Functional Tool; authenticated user credentials; audit logs; user certification or training requirements; tool-function tiering; role-based permissions; emissions-specific safeguards; anti-tampering controls; contractual use restrictions; and remedies for misuse. Deere already provides access to the Fully Functional Tool to thousands of Deere Dealer technicians, demonstrating that controlled access is feasible. Deere's decision to combine dealer-only licensing, contractual prohibitions, technological access controls, misleading public statements, dealer coordination, tying, and parts steering therefore reflects exclusionary conduct designed to maintain Deere's repair aftermarket monopoly, not conduct reasonably necessary to achieve legitimate procompetitive objectives.

---

[70] *See In re Deere & Co.*, 703 F. Supp. 3d at 911.

216. Plaintiff and members of the Class have been injured by Deere's anticompetitive and monopolistic conduct, including by, for example, paying higher prices for Restricted Deere C&F Repairs and by restricting them from exercising their choice of independent repair services or self-repair options. Plaintiff and members of the Class have also been injured by paying higher prices for such repairs by Deere Dealers for Deere C&F Parts, without the option of purchasing cost-saving alternatives.

**SECOND CAUSE OF ACTION**
**Agreement in Restraint of Trade / Group Boycott in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**(Per Se or Rule of Reason)**

217. Plaintiff realleges and incorporates by reference the allegations in all of the paragraphs above.

218. Deere and the co-conspirator Deere Dealers have colluded to create a joint boycott of any entities that could compete to provide any of the Restricted Deere C&F Repairs in the United States. Deere and the co-conspirators collaborated to successfully deny access to the necessary Fully Functional Tool to anyone outside the authorized Deere Dealer network and to prevent IRPs, who are horizontal competitors of the Deere Dealers in the relevant market, from competing to provide Restricted Deere C&F Repairs. Similarly, this same conduct prevents Deere C&F owners from making Restricted Deere C&F Repairs themselves.

219. This conduct has the effect of artificially raising, fixing, maintaining, and/or stabilizing prices in the Restricted Deere C&F Repairs aftermarket in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

220. Deere and its co-conspirators' coordinated refusal to provide access to the necessary repair tools constitutes a per se violation of Section 1 of the Sherman Act as well as, in the alternative, a violation under the rule of reason.

63

221. Deere orchestrated this group boycott by entering into materially uniform vertical agreements with its authorized Deere Dealers that have the intent and effect of restricting access to the Fully Functional Tool to anyone outside of the authorized Deere Dealer network.

222. The agreements and coordinated Deere Dealer conduct also and alternatively constitute a hub-and-spoke horizontal agreement in restraint of trade where Deere serves as the hub and the various Deere Dealers serve as the spokes. Each Deere Dealer understood that other Deere Dealers were subject to and would adhere to the same restrictions, refusing to provide access to the Fully Functional Tool to owners or IRPs. As Judge Johnston in the Ag Class Case found, "no single reasonable Deere Dealership" would sell equipment that had to be repaired by it unless all other dealerships agreed to abide by the same restriction, because owners would simply purchase from a dealer without such a restriction.[71] Deere and all co-conspirator Deere Dealers understand that all Deere Dealers are subject to similar restrictive agreements with Deere and coordinated to enforce restrictions through trade associations such as NAEDA, JDUG, and AED.

223. Independent of a hub-and-spoke conspiracy, the agreements between Deere and each co-conspirator Deere Dealer unreasonably restrain trade under the rule of reason by foreclosing nearly all competition in the aftermarket for Restricted Deere C&F Repairs.

224. There are no plausible procompetitive business justifications for Deere and the co-conspirator dealers to collectively refuse to sell the Fully Functional Tool to owners or IRPs.

225. Plaintiff and members of the Class have been injured by Deere's and the co-conspirators' anticompetitive conduct, including by paying higher prices for Restricted Deere C&F Repairs and by restricting them from exercising their choice of independent repair services or self-

---

[71] *See In re Deere & Co.*, 703 F. Supp. 3d at 908.

repair options. Plaintiff and members of the Class have also been injured by paying higher prices at Deere Dealers for Deere C&F Parts, without the option of purchasing cost-saving alternatives.

<b>THIRD CAUSE OF ACTION</b>
<b>Unlawful Tying Arrangement in Violation of Section 1 of the<br>Sherman Act, 15 U.S.C. § 1</b>
<b>(Tying Access to/Licensing of the Fully Functional Tool to Restricted Deere C&F Repairs<br>and Deere C&F Parts)</b>

226.    Plaintiff realleges and incorporates by reference the allegations in all of the paragraphs above.

227.    A tying arrangement exists where a seller exercises market power it possesses in one product (the tying product) to force a customer to also buy a different product or products (the tied products). Tying arrangements violate the Sherman Act where the seller has economic power in the tying market and tying the products together affects a substantial volume of commerce in the tied market.

228.    Deere has unlawfully tied access to and licensing of its Fully Functional Tool to Restricted Deere C&F Repairs and the associated Deere C&F Parts needed to effectuate such repairs.

229.    The conduct of Deere and Deere Dealers constitutes a per se violation of Section 1 of the Sherman Act as well as, in the alternative, a violation under the rule of reason.

230.    Access to and licensing of the Fully Functional Tool includes access to full dealer-level diagnostic and repair functionality necessary to perform restricted repairs on Deere C&F equipment, including Service ADVISOR/Operations Center PRO Service dealer functionality, CCMS/DTAC, payload files, ECU programming and reprogramming, DTC clearing, part-pairing, and dealer-level tests and calibrations.

231. The Fully Functional Tool is a separate and distinct product from the Restricted Deere C&F Repairs and from the associated Deere C&F Parts needed to effectuate those repairs. Deere itself markets access to its various repair tools as a separate product, i.e., by offering customers the opportunity to subscribe to Customer Service ADVISOR and Operations Center PRO Service. Deere also separately licenses the Fully Functional Tool to Deere Dealers.

232. There is separate demand for access to and licensing of a Fully Functional Tool. In a competitive market, Deere C&F equipment owners and IRPs would license a Fully Functional Tool with access to CCMS/DTAC, payload files, calibrations, and part-pairing functions if Deere made it available on commercially reasonable terms, in order to perform restricted repairs themselves or, for IRPs, to compete to perform those repairs for owners.

233. Deere possesses overwhelming market power in the market for the licensing of the Fully Functional Tool. Deere is the sole licensor of the Fully Functional Tool, including CCMS/DTAC solutions, payload files, dealer-level calibrations, and part-pairing functions for Deere C&F equipment. Deere therefore controls who can access the Fully Functional Tool, and Deere exclusively licenses and provides access to it to Deere Dealers. No other diagnostic tool, whether the more limited tools Deere sells to owners and IRPs or any other third-party tool, can substitute for the Fully Functional Tool that Deere exclusively licenses to Deere Dealers.

234. There is separate customer (owner) demand for repair services (i.e., repair labor) and the associated replacement parts needed to effectuate those repairs.

235. In a competitive market absent the complained-of restraints, owners would service their Deere C&F equipment themselves or otherwise utilize the service provider of their choice, including IRPs. Owners and IRPs would also have the choice to purchase lower-cost third-party replacement parts needed to repair their Deere C&F equipment. Such competition would both

66

reduce the cost of repair services offered by Deere Dealers, including the cost of the Restricted Deere C&F Repairs, as well as the cost of Deere C&F Parts.

236. Deere uses its market power over access to and licensing of the Fully Functional Tool to coerce owners to purchase Restricted Deere C&F Repairs and, consequently, associated Deere C&F Parts necessary to effectuate such repairs.

237. Because Deere Dealers have exclusive access to the Fully Functional Tool, and because Deere's dealer agreements prohibit Deere Dealers from sharing that tool with owners or IRPs, owners cannot complete a restricted repair without gaining access to that tool through a Deere Dealer. And because Deere Dealers, pursuant to Deere's dealer agreements and Deere's policies requiring dealers to "actively and aggressively promote" Deere parts, supply and install only Deere C&F Parts in connection with restricted repairs and do not offer customers lower-cost aftermarket parts, an owner who needs a restricted repair is coerced into purchasing both Restricted Deere C&F Repairs and any associated Deere C&F Parts needed to effectuate such repairs.

238. Deere has a direct economic interest in increasing sales of its Deere C&F Parts.

239. Christy Webber's experience is illustrative. Christy Webber was forced to bring its Deere C&F equipment to West Side for complete repair diagnostics, which can only be performed at a Deere Dealer using the Fully Functional Tool. When its Deere C&F equipment required dealer-diagnosed, restricted repairs, Christy Webber had no choice but to allow West Side to perform the repair service at artificially inflated dealer labor rates using only Deere C&F Parts that were similarly sold at artificially high prices, and did not offer Christy Webber the option of servicing the diagnosed repairs themselves or at a lower-cost IRP, or by offering Christy Webber the option of using lower-cost third-party replacement parts to effectuate those repairs.

240. Absent Deere's tying arrangement, Deere C&F equipment owners and IRPs with access to the Fully Functional Tool could perform restricted repairs themselves or compete to perform them for owners, and could source replacement parts from competing aftermarket suppliers. Owners would purchase repair labor from in-house mechanics or IRPs at lower hourly rates and without dealer travel and diagnostic charges, and would purchase parts from third-party aftermarket suppliers.

241. The tying arrangement affects a substantial volume of commerce in the tied markets. Deere's parts sales account for roughly 20% of Deere's total equipment sales—approximately $8.7 billion in 2025. Deere Dealers earn gross margins in excess of 30% on parts sales, compared to less than 7% on new equipment, and parts sales account for approximately 17% of total Deere Dealer revenue. The dollar volume of Restricted Deere C&F Repairs and associated Deere C&F Parts purchased by Deere C&F equipment owners during the Class Period as a result of Deere's tying arrangement is in the hundreds of millions of dollars, at minimum.

242. Deere consistently misled Plaintiff and members of the Class about the availability and functionality of its various public-facing diagnostic tools, representing that owners and IRPs could perform most repairs without access to the Fully Functional Tool. But in fact, Deere continued to withhold the dealer-level functions necessary to complete restricted repairs. As a result, Plaintiff and members of the Class were unable to take Deere's tying arrangement into account when conducting lifecycle pricing of Deere C&F equipment at purchase and were locked into purchasing the tied products from Deere Dealers thereafter.

243. There are no legitimate procompetitive business justifications for Deere's tying arrangement. To the extent Deere claims any such justification—including safety, emissions compliance, cybersecurity, IP, trade secrets, warranty integrity, or equipment integrity—each

68

could be addressed through less restrictive alternatives, including by offering to license the Fully Functional Tool, authentication, audit logs, user certification, tool-function tiering, emissions-specific safeguards, anti-tampering locks, and contractual remedies. Deere already provides the same access to the Fully Functional Tool to thousands of Deere Dealer technicians, demonstrating that controlled access is feasible.

244. Plaintiff and members of the Class have been injured by Deere's tying arrangement, including by paying supracompetitive prices for Restricted Deere C&F Repairs and the associated Deere C&F Parts required to effectuate such repairs, and by being deprived of the ability to perform restricted repairs themselves or through IRPs, or to source replacement parts from competing aftermarket parts suppliers.

**FOURTH CAUSE OF ACTION**
**Unlawful Tying Arrangement in Violation of Section 1 of the**
**Sherman Act, 15 U.S.C. § 1**
**(Tying Restricted Deere C&F Repairs to Deere C&F Parts)**

245. Plaintiff realleges and incorporates by reference the allegations in all of the paragraphs above.

246. Plaintiff alleges that there is a second anticompetitive tying arrangement. Here, the tying product is the Restricted Deere C&F Repairs, and the tied product is Deere C&F Parts supplied and installed in connection with such Restricted Deere C&F Repairs.

247. The conduct of Deere and Deere Dealers constitutes a per se violation of Section 1 of the Sherman Act as well as, in the alternative, a violation under the rule of reason.

248. Deere and the Deere Dealers exercise monopoly power in the Restricted Deere C&F Repairs Market through Deere's control of the Fully Functional Tool. Deere is the sole source of the Fully Functional Tool, CCMS/DTAC solutions, payload files, dealer-level calibrations, and part-pairing functions for Deere C&F equipment. Deere makes those resources available only to

69

Deere Dealers, and thus only Deere Dealers can perform Restricted Deere C&F Repairs. No third-party service can substitute for Restricted Deere C&F Repairs.

249. By exercising monopoly power over Restricted Deere C&F Repairs, Deere coerces customers into buying Deere C&F Parts for repairs that could otherwise use third-party aftermarket parts. Because Deere restricts access to the Fully Functional Tool necessary to complete Restricted Deere C&F Repairs, owners cannot complete a restricted repair without purchasing dealer-performed Restricted Deere C&F Repairs. And because Deere Dealers, pursuant to Deere Dealer agreements and Deere's policies requiring dealers to "actively and aggressively promote" Deere C&F Parts, supply and install only Deere C&F Parts in connection with restricted repairs and do not offer customers lower-cost aftermarket parts, an owner who needs a restricted repair is coerced into purchasing both Deere Dealer service and the Deere C&F Parts together.

250. Deere has a direct economic interest in increasing sales of its Deere C&F Parts. Deere C&F Parts are generally priced at a premium to corresponding generic aftermarket parts, even though aftermarket parts sellers may use the same manufacturer as Deere. Deere's requirement that its dealers only use Deere C&F Parts when performing Restricted Deere C&F Repairs has allowed Deere to maintain supracompetitive pricing of such parts.

251. Absent Deere's tying arrangement, Deere C&F equipment owners and IRPs could source replacement parts from competing aftermarket suppliers. Deere's own analyses have shown that its sales of parts are significantly higher when its Dealers perform repairs compared to other repair channels (i.e., self-repair or repairs by IRPs).

252. Christy Webber's experience is illustrative. Christy Webber was forced to bring its Deere C&F equipment to West Side for complete repair diagnostics, which can only be performed at a Deere Dealer using the Fully Functional Tool. When its Deere C&F equipment required dealer-

70

diagnosed, restricted repairs, Christy Webber had no choice but to allow West Side to perform the repair service at artificially inflated dealer labor rates using only Deere C&F Parts that were similarly sold at artificially high prices, and did not offer Christy Webber the option of servicing the diagnosed repairs themselves or at a lower-cost IRP, or by offering Christy Webber the option of using lower-cost third party replacement parts to effectuate those repairs.

253. Deere consistently misled Plaintiff and members of the Class about the functionality of the various Deere diagnostic tools offered to the public, representing that owners and IRPs could perform most repairs without access to the Fully Functional Tool when in fact Deere continued to withhold the dealer-level functions necessary to complete restricted repairs. As a result, Plaintiff and members of the Class were unable to take Deere's tying arrangement into account when conducting lifecycle pricing of Deere C&F equipment at purchase and were locked into purchasing the tied product from Deere Dealers thereafter.

254. The tying arrangement affects a substantial volume of commerce in the tied markets. Deere's parts sales account for roughly 20% of Deere's total equipment sales— approximately $8.7 billion in 2025. Deere Dealers earn gross margins in excess of 30% on parts sales, compared to less than 7% on new equipment, and parts sales account for approximately 17% of total Deere Dealer revenue. The dollar volume of Deere C&F Parts purchased by Deere C&F equipment owners during the Class Period as a result of Deere's tying arrangement is in the hundreds of millions of dollars, at minimum.

255. There are no legitimate procompetitive business justifications for Deere's tying arrangement. To the extent Deere claims any such justification, including safety, product quality, or equipment integrity, these could be achieved through less restrictive means, such as by

71

advertising the quality and superiority of its own parts, rather than using its tying arrangement to deny owners the option of using aftermarket parts at all.

256.    Plaintiff and members of the Class have been injured by Deere's tying arrangement, including by paying supracompetitive prices for Deere C&F Parts and by being deprived of the ability to source replacement parts from competing suppliers of their choosing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully asks that this Court:

- Certifies a Class pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), directs that notice of this action be given to the Class, and appoints Plaintiff as representative of the Class and appoints its counsel of record as co-lead Class counsel;

- Enters judgment against Defendant and in favor of Plaintiff and the Class, holding Defendant liable for the antitrust violations alleged herein;

- Grants permanent injunctive relief enjoining Defendant from continuing to engage in the anticompetitive conduct described above;

- Awards Plaintiff and the Class actual, treble, and exemplary damages as permitted plus pre- and post-judgment interest in accordance with the law;

- Awards Plaintiff and the Class their costs of suit, including reasonable attorneys' fees; and

- Directs such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and members of the Class demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

Dated: May 14, 2026                                      Respectfully submitted,

*/s/ Shannon M. McNulty*
Robert A. Clifford
Shannon M. McNulty
Kristofer S. Riddle
**CLIFFORD LAW OFFICES, P.C**
120 N. LaSalle Street, 36th Floor
Chicago, Illinois 60602
Telephone: (312) 899-9090
rac@cliffordlaw.com
smm@cliffordlaw.com
ksr@cliffordlaw.com

James J. Kovacs*
**SHINDER CANTOR LERNER LLP**
600 14th St. NW, 5th Floor
Washington, DC 20005
Telephone: (646) 960-8611
james@scl-llp.com

Ethan E. Litwin*
Lily Fagin*
**SHINDER CANTOR LERNER LLP**
14 Penn Plaza, Suite 1900
New York, NY 10122
Telephone: (646) 960-8610
ethan@scl-llp.com
lfagin@scl-llp.com

Judith A. Zahid*
Eric Buetzow*
Matt Veldman*
**ZELLE LLP**
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone: (415) 633-1916
jzahid@zellelaw.com
ebuetzow@zellelaw.com
mveldman@zellelaw.com

Christian Hudson*
**CUNEO GILBERT FLANNERY
& LADUCA, LLP**
222 Livingston Street, Unit 2
Brooklyn, NY 11201
Telephone: (202) 789-3960
christian@cuneolaw.com

73

Cody McCracken*
**CUNEO GILBERT FLANNERY
& LaDUCA, LLP**
2445 M Street, Suite 740
Washington, DC 20037
Telephone: (202) 789-3960
cmccracken@cuneolaw.com

*pro hac vice* to be filed

74