**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHRISTY WEBBER & COMPANY, on behalf of itself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>DEERE & COMPANY,<br><br>*Defendant*. | Case No. 1:26-cv-05637<br><br>Hon. Manish S. Shah |

# DEFENDANT DEERE & COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS

# TABLE OF CONTENTS


INTRODUCTION ........ 1

BACKGROUND ........ 3

A. Agricultural Antitrust Litigation ........ 3

B. Allegations Regarding Construction & Forestry Equipment and Repairs ........ 3

LEGAL STANDARD ........ 4

ARGUMENT ........ 5

I. Plaintiff Fails to Plead a Tying Claim. (Counts III and IV) ........ 5

A. Deere Does Not Tie Deere C&F Parts to Restricted Deere C&F Repairs. ........ 6

B. Deere Does Not Tie Anything to the Fully Functional Tool. ........ 9

II. Plaintiff's Monopolization Claim Fails. (Count I) ........ 12

A. Plaintiff Does Not Plead Exclusionary Conduct. ........ 12

B. Deere Cannot Monopolize a Market In Which It Does Not Participate. ........ 14

III. Plaintiff Fails to Plead a Conspiracy. (Count II) ........ 16

CONCLUSION ........ 19

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Advanced Computer Servs. of Michigan, Inc. v. MAI Sys. Corp.*,
845 F. Supp. 356 (E.D. Va. 1994) ....................11, 12

*Agnew v Nat'l Collegiate Athletic Ass'n*,
683 F.3d 328 (7th Cir. 2012) ....................19

*Am. Airlines v. Christensen*,
967 F.2d 410 (10th Cir. 1992) ....................16

*Am. Floral Servs., Inc. v. Florists' Transworld Delivery Ass'n*,
633 F. Supp. 201 (N.D. Ill. 1986) ....................17

*Aquatherm Indus., Inc. v. Fla. Power & Light Co.*,
145 F.3d 1258 (11th Cir. 1998) ....................15

*Baar v. Jaguar Land Rover N. Am., LLC*,
295 F. Supp. 3d 460 (D.N.J. 2018) ....................17

*Beach v. Viking Sewing Mach. Co., Inc.*,
784 F.2d 746 (6th Cir. 1986) ....................7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................4

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
140 F.3d 494 (3d Cir. 1998)....................10

*Chase Mfg., Inc. v. Johns Mansville Corp.*,
No. 19-cv-00872, 2019 WL 2866700 (D. Colo. July 3, 2019) ....................14

*Data General Corp. v. Grumman Sys. Support Corp.*,
36 F.3d 1147 (1st Cir. 1994)....................9, 10, 12

*De Jesus v. Sears, Roebuck & Co., Inc.*,
87 F.3d 65 (2d Cir. 1996)....................10

*Deb v. SIRVA, Inc.*,
832 F.3d 800 (7th Cir. 2016) ....................3

## TABLE OF AUTHORITIES

**Page(s)**

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ....................19

*Diedrich v. Ocwen Loan Servicing, LLC*,
839 F.3d 583 (7th Cir. 2016) ....................5

*Dinosaur Fin. Grp. LLC v. S&P Glob., Inc.*,
No. 22 Civ. 1860, 2023 WL 4562031 (S.D.N.Y. July 14, 2023) ....................18

*Discon, Inc. v. NYNEX Corp.*,
93 F.3d 1055 (2d Cir. 1996), *vacated on other grounds*,
525 U.S. 128 (1998)....................15

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)....................5, 6, 11, 14

*EEOC v. Concentra Health Servs., Inc.*,
496 F.3d 773 (7th Cir. 2007) ....................5

*Fed. Trade Comm'n v. Deere & Co.*,
No. 25-cv-50017, 2025 WL 1638474 (N.D. Ill. June 9, 2025)....................3, 8, 15

*Gibson v. Cendyn Grp., LLC*,
148 F.4th 1069 (9th Cir. 2025) ....................19

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp.*,
No. 3:11-cv-268, 2016 WL 8292207 (N.D. Ind. Mar. 18, 2016) ....................8

*H & B Equipment Co., Inc. v. Int'l Harvester Co.*,
577 F.2d 239 (5th Cir. 1978) ....................17

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*,
602 F.3d 237 (3d Cir. 2010)....................18

*In re Deere & Co. Repair Serv. Antitrust Litig.*,
703 F. Supp. 3d 862 (N.D. Ill. 2023) ....................1, 3, 5, 6, 14, 15, 18, 19

*In re Time Warner Inc. Set-Top Cable Television Box Antitrust Litig.*,
No. 08 Civ. 7616, 2010 WL 882989 (S.D.N.Y. Mar. 5, 2010) ....................8, 9

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) ....................9

**TABLE OF AUTHORITIES**

**Page(s)**

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) ....................8

*Kaufman v. Time Warner*,
836 F.3d 137 (2d Cir. 2016) ....................11

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
952 F.3d 832 (7th Cir. 2020) ....................18

*Northern Pacific Ry. Co. v. United States*,
356 U.S. 1 (1958) ....................5, 7

*NYNEX Corp. v. Discon, Inc.*,
525 U.S. 128 (1998) ....................17

*Pumps & Power Co. v. S. States Indus., Inc.*,
787 F.2d 1252 (8th Cir. 1986) ....................7

*Quality Auto Body, Inc. v. Allstate Ins. Co.*,
660 F.2d 1195 (7th Cir. 1981) ....................16

*Re/Max Int'l, Inc. v. Smythe, Cramer Co.*,
265 F. Supp. 2d 882 (N.D. Ohio 2003) ....................17

*Ryko Mfg. Co. v. Eden Servs.*,
823 F.2d 1215 (8th Cir. 1987) ....................9

*Service & Training, Inc. v. Data General Corp.*,
963 F.2d 680 (4th Cir. 1992) ....................10, 11, 12

*Siva v. Am. Bd. of Radiology*,
38 F.4th 569 (7th Cir. 2022) ....................8

*Siva v. Am. Bd. of Radiology*,
418 F. Supp. 3d 264 (N.D. Ill. 2019), *aff'd*, 38 F.4th 569 (7th Cir. 2022) ....................13

*Spanish Broad. Sys., Inc. v. Clear Channel Commc'ns, Inc.*,
242 F. Supp. 2d 1350 (S.D. Fla. 2003), *aff'd*, 376 F.3d 1065 (11th Cir. 2004) ....................15

*Tarrant Service Agency, Inc. v. American Standard, Inc.,*
12 F.3d 609, 617 (6th Cir. 1993) ....................16

# TABLE OF AUTHORITIES

**Page(s)**

*Telecomm Tech. Servs., Inc. v. Siemens Rolm Commc'ns, Inc.*,
150 F. Supp. 2d 1365 (N.D. Ga. 2000) ....................17

*Toys "R" Us, Inc. v. F.T.C.*,
221 F.3d 928 (7th Cir. 2000) ....................17

*United Asset Coverage, Inc. v. Avaya Inc.*,
409 F. Supp. 2d 1008 (N.D. Ill. 2006) ....................14

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) ....................15

*United Wisconsin Grain Producers LLC v. Archer Daniels Midland Co.*,
144 F.4th 976 (7th Cir. 2025) ....................12

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ....................5

*Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
328 F. Supp. 3d 824 (N.D. Ill. 2018) ....................18

*Williamson v. Curran*,
714 F.3d 432 (7th Cir. 2013) ....................8

**STATUTES**

15 U.S.C.
§ 1 ....................4, 10, 14, 16
§ 2 ....................4, 12, 13, 14

**RULES**

Fed. R. Civ. P. 12(b)(6) ....................4

## INTRODUCTION

This action repackages stale claims challenging Deere's prior repair policies in the agricultural industry, recycling allegations first asserted four years ago (and now nearly resolved). But this litigation is different. Critically different.

While most people associate the name "John Deere" with green tractors, Deere has other business lines, too. Among other things, Deere builds machinery for the construction and forestry ("C&F") industries, competing against heavyweights like Caterpillar, Komatsu, Bobcat, Volvo, Hitachi, and many more. The Complaint here exclusively addresses the C&F industries, not the agricultural industry, which operates in an entirely different competitive landscape. Plaintiff's attempt to piggyback on prior litigation in a different industry fails.

Plaintiff's claim selection—tying, monopolization, and conspiracy—mimics the class complaint from the agricultural litigation. But those plaintiffs alleged Deere was "indisputably the biggest player in the market for Tractors in the United States." *In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 890 (N.D. Ill. 2023). They claimed Deere "abused" its power in that "primary market" by tying repair services "to the purchase of Deere's Tractors." *Id.* at 909–10. The court found those allegations stated both a tying claim and a monopolization claim, "particularly because [the complaint] sufficiently and plausibly allege[d] Deere has market power in the primary [agricultural equipment] market." *Id.* at 912–13. And the court found a conspiracy involving Deere's dealers plausible based on that "Complaint's allegations as a whole," including its broadly defined repair services market. *Id.* at 904, 908. None of that translates here. Plaintiff's core C&F allegations differ materially, and cannot support the same holdings.

To start, unlike in the agricultural litigation, Plaintiff does *not* allege that Deere has a dominant share of an alleged C&F equipment market. Thus, unlike in the agricultural litigation, Plaintiff does not (and cannot) claim Deere leverages power in a primary equipment market to

coerce sales in an aftermarket. Instead, Plaintiff premises its claims *exclusively* on three narrow aftermarkets for: (1) a repair tool it calls the "Fully Functional Tool," (2) an amorphous subset of repairs it calls "Restricted Deere C&F Repairs," and (3) "Deere C&F Parts" associated with those repairs. Limited only to those aftermarkets, Plaintiff tries to plead two types of conditioned-sale (or tying) agreements, but, fatally, fails to allege that Deere has sold *anything* to Plaintiff on the condition that it purchase any other product. These claims cannot survive a motion to dismiss.

*First*, Plaintiff alleges Deere exercised power in the Fully Functional Tool market by conditioning its sale of that tool on customers also purchasing Restricted Deere C&F Repairs and Deere C&F Parts. But Plaintiff's entire Complaint is premised on the allegation that Deere does *not* sell or license the Fully Functional Tool to end customers like Plaintiff. Put simply, there is no sale, conditioned or otherwise, of the Fully Functional Tool to the putative class.

*Second*, Plaintiff alleges Deere exercised power in the market for Restricted Deere C&F Repairs by conditioning the sale of those services on the purchase of Deere C&F Parts. But Plaintiff also alleges Deere does *not* provide repair services to anyone. That allegation eviscerates any theory of a conditioned sale involving repairs. Indeed, of the three alleged aftermarkets, the Complaint admits that Deere only sells parts to end customers and that Deere is *not* the only manufacturer of the parts used in repairs. Thus, Deere does not force anyone to buy anything.

These failures in Plaintiff's tying theories also doom Plaintiff's claim that Deere monopolizes a repair services aftermarket because that claim is based on the same alleged tying conduct. Finally, Plaintiff's conspiracy claim fails because Deere's unilateral decision to license its proprietary technology to its authorized dealers alone is lawful.

Attempting to rehash allegations from a different complaint involving different markets is insufficient to state an antitrust claim. The Court should dismiss this case in its entirety.

## BACKGROUND

### A. Agricultural Antitrust Litigation

The Complaint refers extensively to prior antitrust litigation against Deere & Company (commonly known as John Deere or Deere) related to its agricultural business. *See, e.g.*, Compl. ¶¶ 10, 115, 161, 214, 222. There, the plaintiffs alleged that Deere restricted access to a tool needed to repair its agricultural equipment. *In re Deere*, 703 F. Supp. 3d at 870. The class-action complaint survived a pleading challenge, with the court repeatedly referencing the allegation that "Deere already has market power in the primary market" for the agricultural equipment it allegedly tied to repair services. *Id.* at 898; *accord id.* at 896, 899, 910, 912–913; *see also Fed. Trade Comm'n v. Deere & Co.*, No. 25-cv-50017, 2025 WL 1638474, at *6 (N.D. Ill. June 9, 2025) (rejecting pleading challenge in FTC's monopolization suit that alleged "substantively identical anticompetitive conduct" as the class action). Plaintiff attempts to lean heavily on the agricultural decision, but its recycled allegations ignore critical differences in the C&F context.

### B. Allegations Regarding Construction & Forestry Equipment and Repairs

Though best-known for its agricultural equipment, Deere also manufactures C&F equipment. Compl. ¶¶ 75–78.[1] Plaintiff, a landscaping company, has purchased or leased "nearly 50 pieces of Deere C&F equipment." *Id.* ¶ 30. Whereas Deere allegedly has the "dominant position" in the "agriculture implements and machinery" market, *id.* ¶ 75, plaintiff neither alleges that Deere has market power in any primary market involving C&F equipment nor defines the contours of any such a market, *id.* ¶ 74.

Deere sells its equipment not to end customers, but rather to an "authorized network of C&F dealers and technicians," which Plaintiff refers to as "co-conspirator Deere Dealers." *Id.*

[1] For purposes of this motion, the Complaint's well-pleaded allegations are assumed to be true. *See Deb v. SIRVA, Inc.*, 832 F.3d 800, 809 (7th Cir. 2016).

¶¶ 4, 6, 82. Deere Dealers then re-sell the equipment to end customers and provide repair services. *Id.* Deere itself does not provide repair services. *Id.* ¶¶ 19, 23. Nor does the Complaint allege that Deere receives a cut from the dealers who provide those services.

Plaintiff alleges an aftermarket comprised of a small subset of C&F equipment repairs, which it calls "Restricted Deere C&F Repairs." *Id.* ¶ 4. Plaintiff claims that these repairs can only be "diagnose[d]" and "effect[ed]" with certain proprietary Deere "software and information" that it refers to as the "Fully Functional Tool." *Id.* ¶¶ 5–6. Plaintiff alleges that Deere does not sell or license the Fully Functional Tool to end customers or independent repair providers ("IRPs"); rather, Deere "exclusively license[s]" the Fully Functional Tool to Deere Dealers. *Id.* ¶ 62.

Plaintiff asserts that end customers want to repair their own C&F equipment or use IRPs, but that Deere forces them to use Deere Dealers for Restricted Deere C&F Repairs and buy "Deere C&F Parts" for use in those repairs. *Id.* ¶¶ 4, 8. Yet virtually all of Plaintiff's citations for this alleged forcing scheme address agricultural equipment, not C&F equipment. *See id.* ¶¶ 114–15, 133–139, 148, 153, 161–64, 173–77, 192.

According to Plaintiff, Deere's allegedly "unlawful business practices have inflated the costs of Restricted Deere C&F Repairs and Deere C&F Parts" and have "degraded" Plaintiff's "ability to obtain timely repairs" for its equipment. *Id.* ¶ 12. Plaintiff asserts that these practices violated the antitrust laws. The Complaint alleges three claims under Section 1 of the Sherman Act—two claims of unlawful tying (Counts Three and Four) and one conspiracy claim (Count Two)—and one claim of monopolization under Section 2 (Count One).

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). A complaint may not merely "*avoid foreclosing* possible bases for relief"; rather, the complaint "must actually *suggest* that the

plaintiff has a right to relief by providing allegations that raise a right to relief above the speculative level." *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 777 (7th Cir. 2007) (cleaned up). And "[l]egal conclusions or bare and conclusory allegations . . . are insufficient to state a claim." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 589 (7th Cir. 2016).

## ARGUMENT

Tying is "the heart" of Plaintiff's case, just as it was in the agricultural litigation. *In re Deere*, 703 F. Supp. 3d at 908. Unlike the plaintiffs in the agricultural litigation, however, Plaintiff does not allege that Deere has market power in a primary equipment market. Thus, it does not and cannot allege that Deere ties anything to the sale of its *C&F equipment*. Instead, Plaintiff alleges that Deere (1) ties Restricted Deere C&F Repairs to Deere C&F Parts, and (2) ties the Fully Functional Tool to both Restricted Deere C&F Repairs and Deere C&F Parts. Compl. ¶¶ 228, 249. Based on the same underlying conduct, Plaintiff alleges monopolization of, and a group boycott in, the alleged aftermarket for Restricted Deere C&F Repairs. *Id.* ¶¶ 210, 218. Plaintiff fails to plead critical elements of each claim.

## I. PLAINTIFF FAILS TO PLEAD A TYING CLAIM. (COUNTS III AND IV)

"Tying is conduct in which a firm will 'sell one product [the tying product] but only on the condition that the buyer also purchases a different (or tied) product.'" *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 468 (7th Cir. 2020) (quoting *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958)). At the threshold, a plaintiff must show that there are "two distinct products" and that the defendant "has tied the sale of the two products." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992). A plaintiff must then show that the defendant has sufficient economic power in the tying market. *Id.* at 464. In the agricultural litigation, the plaintiffs alleged only that Deere tied repair services (the tied market) to its agricultural equipment (the tying market), and Deere limited its pleading challenge to the allegations that it had sufficient power in

that tying market. *In re Deere*, 703 F. Supp. 3d at 909. Here, Plaintiff bypasses the highly competitive primary equipment market and exclusively alleges ties between aftermarkets (i.e., repairs, parts, and tools), theories neither pled nor considered in the agricultural litigation. Because neither tying claim pleads the requisite conditioned sale, both claims fail.

**A. Deere Does Not Tie Deere C&F Parts to Restricted Deere C&F Repairs.**

Start with Plaintiff's simplest tying claim. In Count Four, Plaintiff alleges that "Deere and the Deere Dealers exercise monopoly power in the Restricted Deere C&F Repairs Market" to "coerce[] customers into buying Deere C&F Parts for repairs that could otherwise use third-party aftermarket parts." Compl. ¶¶ 248–49. This claim fails because Plaintiff does not plausibly allege that Deere conditioned the sale of repair services on the purchase of parts.

*Kodak*—the seminal aftermarket tying case—also involved an alleged tie between repair services and parts. The Supreme Court found "sufficient evidence of a tying arrangement" where "Kodak would sell parts to third parties [i.e., Kodak equipment owners] only if they agreed not to buy service from ISO's," third-party independent service organizations. 504 U.S. at 463–64. The Supreme Court distinguished that situation from a "unilateral refusal to deal, which does not violate the antitrust laws," because Kodak did not merely "refus[e] to sell parts to any company providing service"; rather, it allegedly sold "parts to third parties *on condition* that they buy service from Kodak." *Id.* at 463 n.8 (emphasis added). Plaintiff has not alleged an analogous tie here.

*First*, unlike in *Kodak*, Plaintiff does not allege that Deere sells both the alleged tying and tied products. It was Kodak's *own* "alleged sale of parts to third parties on condition that they buy service from Kodak" that created the "tie between service and parts." *Id.* By contrast, Plaintiff here does not allege that Deere enters any agreement with end customers related to the sale of repair services or parts. Nor could it, as the Complaint admits that Deere does not sell repair services at all—only independently owned Deere Dealers do. Compl. ¶¶ 59-60. Deere cannot tie

the purchase of one product to the purchase of another product that it does not sell. There simply is no "agreement by [Deere] to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific Ry.*, 356 U.S. at 5-6.

*Second*, Plaintiff does not even allege that Deere indirectly conditions the sale of one product on the purchase of another product. Plaintiff's sole factual contention is that a Deere Dealer—West Side—"utilizes Deere C&F Parts and does not offer [Plaintiff] the option to have repairs completed using non-Deere replacement parts." Compl. ¶ 35; *cf. id.* ¶¶ 65 (summarily alleging that "Deere Dealers only utilize Deere-branded parts"), 71 (same). But Plaintiff acknowledges that these repairs could otherwise be completed using "third-party aftermarket parts." *Id.* ¶ 249. Said differently, Plaintiff does not allege that end customers are unable to purchase non-Deere parts for use in Restricted Deere C&F Repairs—as was true of the tied product in *Kodak*—only that those parts are not provided by its *Deere Dealer*. *Id.* ¶¶ 239 (alleging that "lower-cost third-party replacement parts" could be used "to effectuate" repairs), 66 (same). But a *Deere Dealer's* alleged practice does not plead a tying agreement by *Deere*. *Cf. Pumps & Power Co. v. S. States Indus., Inc.*, 787 F.2d 1252, 1257-58 (8th Cir. 1986) (finding distributor's "own policy . . . of discouraging . . . orders from competitor" manufacturers did not support conspiracy with manufacturer supplying distributor); *Beach v. Viking Sewing Mach. Co., Inc.*, 784 F.2d 746, 750 (6th Cir. 1986) (finding distributor's "sole[] decision[]" to "den[y] a dealership to plaintiffs" did not support conspiracy with manufacturer). Deere is not alleged to have coerced any end customer to buy anything it sells.

To be sure, the Complaint summarily alleges that Deere Dealers "agreed to use only Deere-manufactured replacement parts to repair C&F equipment," Compl. ¶ 49, but that does not change

the fact that end customers can purchase non-Deere parts from third parties. Moreover, this conclusory allegation contradicts the same source that the Complaint cites to allege knowledge of "Deere's agreements with dealerships." *Id.* ¶ 192 (citing Compl. ("FTC Compl."), *Fed. Trade Comm'n v. Deere & Co.*, No. 25-cv-50017 (N.D. Ill. Jan. 15, 2025), ECF No. 1). That source states that the "dealership agreement[s] between Deere and its dealers" only "require Deere dealers to 'actively and aggressively *promote* the sale of [Deere] Parts and Service' and 'maintain . . . inventories of Parts,'" "Deere dealers source the vast *majority* of parts from Deere," and "Deere dealers' *almost* exclusive use of Deere OE parts when performing repairs on Deere equipment" contrasts with equipment-owner and IRP usage of Deere parts. FTC Compl. ¶¶ 80–82 (emphasis added); *see also Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) (Courts may consider documents cited in the complaint where plaintiff "relied on their contents as support for her claims."). "A tie is illegal only when the seller 'exploit[s] … its control over the tying product to *force* the buyer into the purchase of a tied product[.]'" *Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 573 (7th Cir. 2022) (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12–13 (1984)) (emphasis added). Thus, "strong persuasion, encouragement, or cajolery"—*i.e.*, aggressive promotion—do not suffice. *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp.*, No. 3:11-cv-268, 2016 WL 8292207, at *5 (N.D. Ind. Mar. 18, 2016) (quotation omitted).

All Plaintiff alleges is that Deere Dealers "promote" Deere parts, Compl. ¶¶ 13, 84, 192, 237, 249, while acknowledging that "third-party replacement parts" exist, *id.* ¶¶ 66, 239. "The option" to purchase "alternative" parts "was available to all [end] customers." *In re Time Warner Inc. Set-Top Cable Television Box Antitrust Litig.*, No. 08 Civ. 7616, 2010 WL 882989, at *5, *7 (S.D.N.Y. Mar. 5, 2010) (distinguishing *Kodak* and dismissing tying claim). This fact is fatal to Plaintiff's theory. Indeed, even if third-party parts are "neither well-promoted nor achieve[]

widespread commercial success," that fact "is insufficient to establish actual coercion." *Id.* at *8.[2]

Absent allegations that Deere conditions the sale of Restricted Deere C&F Repairs on the purchase of Deere C&F Parts, the Complaint fails to plead that Deere ties parts to services.

**B. Deere Does Not Tie Anything to the Fully Functional Tool.**

In Count Three, Plaintiff attempts to plead a second tying claim, in which the tying product is the Fully Functional Tool and the tied products are both "Restricted Deere C&F Repairs and the associated Deere C&F Parts needed to effectuate such repairs." Compl. ¶ 228. This tie also fails.

*First*, in alleging that Deere ties the Fully Functional Tool to parts, Plaintiff simply restates the alleged tie from Count Four. There, Plaintiff alleges that "Deere and the Deere Dealers exercise monopoly control in the Restricted Deere C&F Repairs market *through Deere's control of the Fully Functional Tool*," and then Deere uses that power to "coerce[] customers into buying Deere C&F Parts." Compl. ¶ 249 (emphasis added). Whether Plaintiff frames the tying market as the Fully Functional Tool or Restricted Deere C&F Repairs, no allegations support the claim that Deere forces equipment owners to purchase Deere C&F Parts. *See supra* Part I.A.

*Second*, the Complaint does not allege that Deere conditions sales or licenses of the Fully Functional Tool—"a good," distinct from the "use of" software, which is a service—on the purchase of repair services. *Data General Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1179 (1st Cir. 1994). In fact, it alleges that Deere does *not* sell or license the Fully Functional Tool to customers or IRPs; rather, Deere limits licenses to that proprietary technology to Deere Dealers. *See* Compl. ¶¶ 6, 20, 105. Plaintiff's theory thus runs afoul of the "fundamental principle

[2] *See also It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 684 (4th Cir. 2016) (rejecting tying claim where "competitors were not foreclosed from selling alternatives to" allegedly tied item); *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1236 (8th Cir. 1987) (rejecting tying claim where "Eden merely was bound by its contractual obligation as a Ryko distributor not to promote or sell products that competed with Ryko products").

of antitrust law that an illegal tying arrangement requires that at least two products and/or services be purchased *by the same individual*." *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 71 (2d Cir. 1996) (citation omitted); *see also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 510 (3d Cir. 1998) ("Tying exists where a seller conditions the sale of one good (the tying product) on *the buyer also purchasing* another, separate good (the tied product).") (emphasis added). For a plaintiff to complain it has been forced to buy an undesired product as a condition of its buying a desired product, the latter must be something that the defendant "is selling" to that plaintiff in the first place. *De Jesus*, 87 F.3d at 71.

Consistent with that rule, courts rejected similar tying claims decades ago in a series of cases involving a tool developed by computer manufacturer Data General to diagnose malfunctions in its computers. *See, e.g.*, *Service & Training, Inc. v. Data General Corp.*, 963 F.2d 680, 682 (4th Cir. 1992); *Data General*, 36 F.3d at 1156. In the lead case, third-party maintenance companies (TPMs) claimed that "Data General's refusal to sell or license [the tool] to all customers, including TPMs, and its decision to require customers who want access to [the tool] to purchase support services from Data General, amounts to a *per se* unlawful tying arrangement under Section 1 of the Sherman Act." *Service & Training*, 963 F.2d at 683 (cleaned up). The Fourth Circuit rejected that claim. TPMs—who purchased repair services from Data General—could not establish a tying agreement because they did not enter any agreements with Data General to "license [the tool] … in connection with its provision of repair services." *Id.* at 686–87. Absent a license agreement *with those customers*, Data General could not condition the sale of repair services *to those customers* on such a license.

That Data General licensed the tool to a *different* class of customers—cooperative maintenance organizations (CMOs)—did not establish a tie either, because Data General did not

agree "to license [the tool] to CMOs only on the condition that the CMOs also purchase Data General's repair services. *CMOs do not even purchase repair services*[.]" *Id.* at 686 (emphasis added). Absent a sale of both the tied and tying product to CMOs, there was no conditioned sale to that class of customers any more than there was to TPMs. *See id.*

The same is true here. Deere's alleged *refusal* to sell or license the alleged tying product (the Fully Functional Tool) to end customers—the only entities purportedly being forced to purchase the alleged tied product (repair services)—precludes a finding of a tie. More broadly, "[t]he fact that [Deere] has selectively licensed [the Fully Functional Tool] is not evidence of an illegal tying agreement." *Id.*; *see also Advanced Computer Servs. of Michigan, Inc. v. MAI Sys. Corp.*, 845 F. Supp. 356, 369 (E.D. Va. 1994) ("[S]elective licensing, even if it affects the ability of competitors to provide repair services, does not constitute evidence of an express, or even implied, tying agreement."). Deere is entitled to make a "unilateral decision" to "license [the Fully Functional Tool] to [Deere Dealers] but not to others." *Service & Training*, 963 F.2d at 686.

*Third*, if Plaintiff contends Deere forced end customers to purchase Restricted Deere C&F Repairs from Deere Dealers as a condition of gaining *access* to Fully Functional Tool services, Compl. ¶¶ 38, 239, Plaintiff's claim fails because the latter is the same product as the former. *See Kodak*, 504 U.S. at 462 (requiring "two distinct products"); *see also Kaufman v. Time Warner*, 836 F.3d 137, 144–45 (2d Cir. 2016) (affirming dismissal where plaintiff failed to plausibly allege that cable boxes and cable services were "separate products"). Plaintiff alleges that "Restricted Deere C&F Repairs include the diagnosis, maintenance, and repair services for Deere C&F equipment that require access to the Fully Functional Tool." Compl. ¶ 59; *see also id.* ¶ 68. It further alleges that restricted "repairs require a Fully Functional Tool, which is uniquely capable of clearing error codes and restoring equipment to working order." *Id.* ¶ 106; *see also id.* ¶¶ 38, 117, 119. Put

otherwise, access to the Fully Functional Tool is alleged to provide both the diagnostic and repair services that equipment owners want to purchase together.

Plaintiff summarily alleges that there is "separate demand for access to" the Fully Functional Tool, but it claims that "equipment owners and IRPs" want that access "in order to perform restricted repairs." *Id.* ¶ 232. Again, courts have long rejected similar claims. For instance, in *Service & Training*, the court explained that if "access" to diagnostic software were "considered the tying product," there would be no "separate tying and tied products" absent "evidence that there are customers who would purchase [the tool's] diagnostic services separately from all other repair services." 963 F.2d at 685 n.9, 688 n.16; *see also Data General*, 36 F.3d at 1179 (same); *cf. Advanced Computer Services*, 845 F. Supp. at 368 (finding "repair services" distinct from "MAI software," where plaintiffs conceded "they are able to repair MAI computers *without accessing MAI software*") (emphasis added). So too here. There are no well-pled allegations that end customers want access to the Fully Functional Tool's diagnostic services separate from its repair services, precluding a tying claim.

## II. PLAINTIFF'S MONOPOLIZATION CLAIM FAILS. (COUNT I)

For a Section 2 claim, a plaintiff must establish "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power through exclusionary conduct." *United Wisconsin Grain Producers LLC v. Archer Daniels Midland Co.*, 144 F.4th 976, 980 (7th Cir. 2025) (cleaned up). Plaintiff fails to plausibly allege either element.

### A. Plaintiff Does Not Plead Exclusionary Conduct.

Again attempting to take a page out of the agricultural playbook, Plaintiff premises its monopolization claim (Count One) on the same allegedly exclusionary conduct as asserted in its tying claims. But, as explained above, the agricultural plaintiffs pleaded a different tie that Plaintiff cannot assert here. And unlike in the agricultural litigation, Plaintiff fails to plead a plausible tying

claim. *See supra* Part I. That pleading failure also defeats Plaintiff's monopolization claim.

Paragraph 211 of the Complaint identifies the allegedly "exclusionary conduct" that Plaintiff relies on to meet the second element of its Section 2 claim. Every single allegation in that paragraph repeats an allegation from Plaintiff's tying claims:

| **Monopolization Conduct (¶ 211)** | **Tying Conduct** |
|---|---|
| "[D]esigning Deere C&F equipment so that the diagnosis and completion of Restricted Deere C&F Repairs require the Fully Functional Tool." | "[C]omplete repair diagnostics" on Deere's equipment "can only be performed . . . using the Fully Functional Tool," ¶ 239, and "owners cannot complete a restricted repair without gaining access to that tool." ¶ 237. |
| "[L]icensing the Fully Functional Tool exclusively to Deere Dealers." | "Deere exclusively licenses [the Fully Functional Tool] to Deere Dealers." ¶ 233. |
| "[U]sing technological controls [and] restrictions to prevent owners and IRPs from obtaining equivalent functionality." | Deere "controls who can access the Fully Functional tool" and no "substitute" for that functionality is available to "owners and IRPs." ¶ 233. |
| "[I]mposing materially uniform dealer agreements that prohibit Deere Dealers from" sharing the Fully Functional Tool. | "Deere's dealer agreements prohibit Deere Dealers from sharing [the Fully Functional Tool] with owners or IRPs." ¶ 237. |
| "[C]oordinating with Deere Dealers to ensure those restrictions are uniformly followed." | "Deere Dealers, pursuant to Deere's dealer agreements and Deere's policies," enforce the alleged restrictions. ¶ 237. |
| "[O]ffering owners and IRPs degraded customer-facing tools while misleadingly representing that owners" can repair their own equipment. | Deere misled customers "about the availability and functionality of its various public-facing diagnostic tools," while "withhold[ing] the dealer-level functions necessary to complete restricted repairs." ¶ 242. |
| "[U]sing the resulting lock-in to steer owners to Deere Dealers for Restricted Deere C&F Repairs and associated Deere C&F Parts." | Deere equipment owners "were locked into purchasing the tied products from Deere Dealers." ¶ 242. |

These claims all challenge the same conduct. And where plaintiffs fail to plausibly allege tying, courts routinely dismiss monopolization claims premised on that form of exclusionary conduct. *See, e.g.*, *Siva v. Am. Bd. of Radiology*, 418 F. Supp. 3d 264, 277 (N.D. Ill. 2019), *aff'd*, 38 F.4th 569 (7th Cir. 2022) (dismissing monopolization claim where "Plaintiff's principal

allegations of anticompetitive conduct are of tying," but "plaintiff does not state a tying claim"); *Chase Mfg., Inc. v. Johns Mansville Corp.*, No. 19-cv-00872, 2019 WL 2866700, at *7 (D. Colo. July 3, 2019) ("[T]he Complaint fails to state a monopoly claim based on tying and likewise fails to state a stand-alone tying claim."). Plaintiff's claim deserves the same fate.

Plaintiff emphasizes that Judge Johnston found a Section 2 claim adequately pleaded in the agricultural litigation. *Id.* ¶ 214. But Judge Johnston relied on *Kodak*, which, like the agricultural case, "was both a tying claim brought under [Section] 1 and a monopolization claim under [Section] 2 of the Sherman Act." *In re Deere*, 703 F. Supp. 3d at 912. In *Kodak*, the alleged conduct satisfying the exclusionary conduct prong of the Section 2 claim was the conduct "recounted at length" in the Supreme Court's tying analysis. *Kodak*, 504 U.S. at 483; *accord id.* at 463 & n.8. Unlike in *Kodak*, however, Plaintiff here has not made out its tying claim. *Cf. United Asset Coverage, Inc. v. Avaya Inc.*, 409 F. Supp. 2d 1008, 1045-46 (N.D. Ill. 2006) (finding no likelihood of success on monopolization claim and distinguishing *Kodak*, which alleged a "classic case of illegal tying" based on withholding of "repair parts in which it had no proprietary interest").

Finally, conceding Deere does not even *participate* in the repair services market it allegedly monopolizes, Plaintiff alleges that Deere benefits from the sale of "associated Deere C&F Parts." Compl. ¶ 211; *accord id.* ¶ 191. But, again, absent allegations that Deere Dealers must use Deere C&F Parts to perform Deere C&F Restricted Repairs, *see supra* Part I.A, the Complaint does not plausibly allege that Deere has attempted to "maintain" any theoretical service monopoly to drive sales of Deere C&F Parts—meaning that it fails to allege exclusionary conduct.

**B. Deere Cannot Monopolize a Market In Which It Does Not Participate.**

Plaintiff does not plausibly allege that Deere possesses market power in the "aftermarket for Restricted Deere C&F Repairs" either. Compl. ¶ 210. After all, Plaintiff acknowledges that Deere does not itself provide repair services. *See, e.g.*, *id.* ¶¶ 19, 23. Notwithstanding Judge

Johnston's contrary decision in the agricultural litigation based on the distinct allegations there, Deere cannot monopolize a market in which it does not participate. *Contra In re Deere*, 703 F. Supp. 3d at 911; *FTC*, 2025 WL 1638474, at *4–5.

Courts routinely dismiss monopolization claims premised on the argument that a firm can "monopolize a market in which it does not compete." *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998). In *Discon*, the plaintiff, a competitor in the market for "removal services" for telephone companies, alleged that several telephone service providers monopolized the market for removal services. *Id.* at 1057–58, 1061. But the providers were only purchasers in the removal services market; they did not "compete[]" in that market. *Id.* at 1062. The court thus held that the plaintiff's "claim of monopolization must fail." *Id.*; *see also, e.g.*, *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258, 1261 (11th Cir. 1998); *Spanish Broad. Sys., Inc. v. Clear Channel Commc'ns, Inc.*, 242 F. Supp. 2d 1350, 1364 (S.D. Fla. 2003), *aff'd*, 376 F.3d 1065 (11th Cir. 2004).

Deere recognizes that Judge Johnston viewed this issue differently in the agricultural litigation. Relying on the Supreme Court's canonical formulation of monopoly power in *Grinnell*, Judge Johnston refused to dismiss the plaintiffs' monopolization claims because, in his view, they plausibly alleged that Deere had the power "to control prices or exclude competition" from the market. *In re Deere*, 703 F. Supp. 3d at 911 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)); *see also FTC*, 2025 WL 1638474, at *4–5 (same). But *Grinnell* cannot bear the weight placed on it. There, the defendant not only competed in the relevant market, but also had obtained a dominant share of it. 384 U.S. at 567, 576. *Grinnell* thus had no occasion to consider whether companies can monopolize markets in which they do not compete, nor is there any hint that the Court had that issue in mind. The only plausible reading of *Grinnell* is that it offered a

definition of monopoly power as the standard for assessing whether a firm has monopolized *its own* market. Where a defendant is not in the market, like here, *Grinnell* does not apply.

Plaintiff's monopolization claim should be dismissed on this ground alone.

## III. PLAINTIFF FAILS TO PLEAD A CONSPIRACY. (COUNT II)

Plaintiff's final claim (Count Two) asserts a group boycott to foreclose competition in the aftermarket for Restricted Deere C&F Repairs. Compl. ¶¶ 218–21. In the alternative, it alleges a hub-and-spoke or vertical conspiracy. *Id.* ¶¶ 222–23. None of these theories has merit.

***Group Boycott.*** Despite alleging that Deere and its "co-conspirator Deere Dealers" "collaborated to successfully deny access to the necessary Fully Functional Tool to anyone outside the authorized Deere Dealer network." *id.* ¶ 218, Plaintiff admits that Deere alone developed and owns the Fully Functional Tool for use with its own equipment, *id.* ¶ 19 (alleging "[o]nly Deere has access to the information needed to develop a Fully Functional Tool" and maintains "exclusive access" to it "through complex encryption technology"). That admission controls the analysis.

Deere's *unilateral* decision to license the Fully Functional Tool solely to Deere Dealers is not a "concerted refusal to deal" with others. *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1206 (7th Cir. 1981) (defining "group boycott"). Indeed, courts recognize that a manufacturer acts unilaterally when it imposes a policy that its distributors must follow and enforce. In *Tarrant Service Agency, Inc. v. American Standard, Inc.*, for instance, the court held that the manufacturer of HVAC equipment acted unilaterally where it prohibited independently-owned and company-owned distributors of its parts from selling to independent repair companies. 12 F.3d 609, 617 (6th Cir. 1993). Here, too, Deere acted independently by choosing to provide the Fully Functional Tool solely to Deere Dealers and ensuring that the dealers followed that policy. The mere fact that Deere Dealers "accepted" terms that Deere "independently set . . . does not generate the kind of concerted action needed to violate Section 1." *Am. Airlines v. Christensen*,

967 F.2d 410, 413–14 (10th Cir. 1992).[3]

Moreover, Plaintiff does not allege that *Deere Dealers* conspired to coerce Deere into refusing to deal with the dealers' competitors for repair services. Rather, Plaintiff alleges that *Deere* "orchestrated this group boycott." Compl. ¶ 221. This means that any agreement about repair services Plaintiff alleges between Deere and its dealers would be a *vertical*, rather than a horizontal, agreement. *See, e.g.*, *Am. Floral Servs., Inc. v. Florists' Transworld Delivery Ass'n*, 633 F. Supp. 201, 218 (N.D. Ill. 1986) (finding "restrictions placed" by suppliers "on the activity of their member florists" vertical because they were "between one level of an industry and another"); *H & B Equipment Co., Inc. v. Int'l Harvester Co.*, 577 F.2d 239, 245–46 (5th Cir. 1978) ("[C]onspiracies between a manufacturer and its distributors are only treated as horizontal . . . when the source of the conspiracy is a combination of the distributors."). Plaintiff thus cannot establish that the alleged "group boycott" is per se illegal, *contra* Compl. ¶ 220, as "the per se rule in the boycott context" is "limit[ed]" to "cases involving horizontal agreements among direct competitors." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998).

Finally, Plaintiff does not allege that Deere refused to deal with *its own competitors*—*i.e.*, other manufacturers. *Cf. Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 936 (7th Cir. 2000) (finding conspiracy where "TRU was trying to disadvantage the warehouse clubs, *its competitors*, by coercing suppliers to deny the clubs the products they needed"). Plaintiff's group boycott theory—

---

[3] *See also Baar v. Jaguar Land Rover N. Am., LLC*, 295 F. Supp. 3d 460, 465 (D.N.J. 2018) (finding plaintiff failed to allege concerted action where "Defendants unilaterally implemented the Policy and required their dealers to enforce it"); *Re/Max Int'l, Inc. v. Smythe, Cramer Co.*, 265 F. Supp. 2d 882, 900 (N.D. Ohio 2003) (dismissing where there were "no allegations that [the defendant] did anything more than unilaterally impose the adverse split policy with the agents merely acquiescing"); *Telecomm Tech. Servs., Inc. v. Siemens Rolm Commc'ns, Inc.*, 150 F. Supp. 2d 1365, 1371 (N.D. Ga. 2000) (finding "a manufacturer imposing upon a distributor a policy circumscribing with whom that distributor may deal is not involved in a concerted action").

in which Deere allegedly orchestrated a boycott of IRPs with which it does not compete—fails.

***Hub-and-Spoke Conspiracy.*** As a fallback, Plaintiff alleges a "hub-and-spoke horizontal agreement in restraint of trade where Deere serves as the hub and the various Deere Dealers serve as the spokes" in "refusing to provide access to the Fully Functional Tool to owners or IRPs." Compl. ¶ 222. At base, then, the Complaint alleges Deere refuses to license its technology to anyone but Deere Dealers. But that is no more a hub-and-spoke conspiracy than it is a tie. Plaintiff alleges only vertical agreements between Deere and Deere Dealers without plausibly alleging a rim. *See Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842 (7th Cir. 2020).

Plaintiff alleges no *direct* evidence of a rim agreement. Instead, it tries to allege parallel conduct. But knowledge that other dealers "are subject to similar restrictive agreements" does not suffice to show an agreement between the dealers. Compl. ¶ 222; *see, e.g.*, *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010) (dismissing complaint alleging dealers were "required to agree to the same exclusive dealing arrangement" but failing to allege any "agreement among the Dealers themselves"); *Dinosaur Fin. Grp. LLC v. S&P Glob., Inc.*, No. 22 Civ. 1860, 2023 WL 4562031, at *18 (S.D.N.Y. July 14, 2023) (rejecting horizontal conspiracy where "the most logical conclusion is that Third-Party Data Vendors simply wanted to distribute CGS data"). And vague allegations about "coordinat[ion] . . . through trade associations" are similarly insufficient. Compl. ¶ 222; *see, e.g.*, *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 843 (N.D. Ill. 2018) ("[A]llegations that defendants were members of the same trade organizations are unspectacular and fail to move the needle.").

Plaintiff is thus left to rely on Judge Johnston's statement in the agricultural litigation that "no single reasonable Deere Dealership would sell Deere Tractors that had to be repaired only by it" absent an agreement "that others would follow suit." *In re Deere*, 703 F. Supp. 3d at 908. But

that reasoning flows from the agricultural plaintiffs' allegations, which defined "Repair Services" broadly as "repair and maintenance services." *Id.* at 871. Unlike the agricultural plaintiffs, Plaintiff here alleges only that a narrow subset of repairs—restricted repairs—could be performed solely by Deere Dealers, not that a single dealer must perform all repairs on the C&F equipment it sells, as Judge Johnston found. There are no alleged restrictions on the vast majority of repairs in this case, and thus nothing unreasonable about a single dealer independently agreeing to the narrow repair restriction alleged here. Nor does Plaintiff allege, as the agricultural plaintiffs did, that Deere holds a dominant position in the C&F equipment market. A dealer's decision to accept the terms of one manufacturer among many in a competitive market to gain access to that manufacturer's products is entirely consistent with the dealer's independent self-interest.

***Vertical Agreements.*** As a further fallback, Plaintiff alleges that "[i]ndependent of a hub-and-spoke conspiracy, the agreements between Deere and each co-conspirator Deere Dealer unreasonably restrain trade under the rule of reason." Compl. ¶ 223. But a rule of reason claim requires "market power" and "anticompetitive effect[s] on a given market." *Agnew v Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). And the Complaint contains no allegation—nor is there any basis to allege—that either exists when considering each vertical agreement between Deere and a Deere Dealer on its own. Nor can the agreements be aggregated to meet these requirements. *See Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1087 (9th Cir. 2025) ("antitrust law provides no mechanism by which courts can evaluate the independent agreements . . .'in the aggregate'"); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 210 (4th Cir. 2002) (courts may "not consider the cumulative harm" of discrete vertical agreements). Plaintiff thus cannot demonstrate a rule of reason violation based on Deere's vertical agreements with its dealers.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint in its entirety.

Dated: August 10, 2026

Respectfully submitted,

By: */s/ Lin W. Kahn*

John M. Majoras
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, DC 20001
Telephone: (202) 879-3939
jmmajoras@jonesday.com

Tiffany D. Lipscomb-Jackson
**JONES DAY**
325 John H. McConnell Boulevard, Suite 600
Columbus, OH 43215
Telephone: (614) 281-3876
tdlipscombjackson@jonesday.com

Corey A. Lee
**JONES DAY**
North Point, 901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
calee@jonesday.com

Paxton J. Lozano (6339313)
**JONES DAY**
110 North Wacker, Suite 4800
Chicago, IL 60606
Telephone: (312) 269-4121
plozano@jonesday.com

Lin W. Kahn
Matthew J. Silveira
Christina N. Fulponi
**JONES DAY**
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
lkahn@jonesday.com
msilveira@jonesday.com
cfulponi@jonesday.com

*Counsel for Defendant Deere & Company*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed using the CM/ECF system, which will effectuate service on all counsel of record.

*/s/ Lin W. Kahn*
Lin W. Kahn
*Counsel for Defendant Deere & Company*